[824 NYS2d 48]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v TEMEL GREENE, Appellant.

First Department, November 9, 2006

**APPEARANCES OF COUNSEL**

*Richard M. Greenberg, Office of the Appellate Defender*, New York City (*Jonathan Marvinny* and *Rosemary Herbert* of counsel), for appellant.

*Robert T. Johnson, District Attorney*, Bronx (*Yael V. Levy* and *Stanley R. Kaplan* of counsel), for respondent.

**OPINION OF THE COURT**

SULLIVAN, J.P.

In October 2001, defendant and Julio Cuello, known as Tigerito, got into a fight over a woman, as a result of which defendant's face was cut from the left ear to his chin. Defendant was treated at Lincoln Hospital for his wound, which was stitched and bandaged. That incident provided the impetus for a subsequent shooting incident that led to the death of Anthony Berrios. The primary issue on appeal from defendant's conviction for that homicide is his claim that certain information provided by a Lincoln Hospital administrator as to the treatment of a person for a facial wound was obtained in violation of the statutory physician-patient privilege,* as it relates to defendant. As a result, he argues, the information obtained from the violation and its fruits—his arrest and identification from a photo array and in a lineup—implicated a constitutionally protected right and must be suppressed.

The suppression hearing adduced the following evidence. Assigned to the shooting death of 16-year-old Berrios, which had occurred at Eastburn Avenue and the service road of the Cross-Bronx Expressway on the morning of October 17, 2001, Detective Elliott learned from the victim's aunt that the "word on the street" was that the killing was in revenge for a slashing of a "male black" at the Rumba Club several days earlier. Tigerito, the slasher, told Detective Elliott that he had heard that the shooters were "some black guys" from around 168th Street and College Avenue. Detective Elliott also interviewed Tony Coston, who related that at about one o'clock on the morning of the shooting, he had heard gunshots and saw a "male black" with a gun pursue a "young Spanish boy" down Weeks Avenue toward the Cross-Bronx Expressway. Coston heard more gunshots and heard the black man say, "I told you to stay off the block."

On October 18, Detective Elliott went to Lincoln Hospital and asked an administrator, Ms. Brown, "if there was any male blacks that were treated on October 13 for any kind of slash wounds to the face" or "if anyone came in for a slashing to the face on that date, October 13th." Ms. Brown gave Detective El-

---

* CPLR 4504 (a), applicable to criminal actions (CPL 60.10; *see People v Al-Kanani*, 33 NY2d 260, 264 n [1973], *cert denied* 417 US 916 [1974]), provides: "Unless the patient waives the privilege, a person authorized to practice medicine . . . shall not be allowed to disclose any information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity."

liott an admission slip with defendant's name and address, 2080 Barnes Avenue, and told him that defendant had received stitches on the left side of his face. That same day, in a police car, Detective Elliott showed Tony Coston a computer-generated black and white photo array containing a "couple of years old" photograph of defendant. Coston recognized two people in the array, one of whom was defendant, but he "wasn't too sure" of his identification and "didn't want to say yes or no" because it was nighttime and the light in the police car was "pretty bad." Coston asked to see a more recent photograph or a live person under better lighting conditions.

Having learned from police computer records that defendant had been arrested several times around 168th Street and College Avenue, Detective Elliott searched that area. On October 20, he saw defendant at 168th Street and Findlay Avenue. As the detective approached, defendant removed a silver gun from his waistband and threw it into a garbage can. The detective arrested defendant, who had a "fresh," "long" scar from below his ear to close to his chin on the left side of his face, and retrieved the gun, a loaded .357 magnum.

The following day, Detective Elliott went to Coston's home and showed him a new photo array containing defendant's arrest photograph, but not the photograph of the other person Coston had previously recognized in the first array. This time, Coston recognized defendant's photograph "right away." That same day, four hours later, Coston viewed a lineup at the Bronx Homicide Task Force. Although the five fillers ranged in age from 30 to 35, and defendant was 23 at the time, Detective Elliott, who would not have conducted the lineup if the fillers had not fit defendant's description, thought they "all looked similar." After viewing the lineup for a few seconds, Coston identified defendant.

In urging suppression of the pretrial identifications as fruit of the poisonous tree, defendant argued that the information obtained from Lincoln Hospital violated defendant's physician-patient privilege as set forth in CPLR 4504 and his right to privacy under the Fourth Amendment. Defendant also argued that the second photo array and lineup were suggestive because only defendant, and not the second person whom Coston had recognized in the first photo array, appeared in them.

The prosecutor argued that the information obtained from Lincoln Hospital was not protected by the physician-patient privilege, which does not extend to readily observable physical

phenomena that do not involve a patient's medical treatment. Moreover, he argued, any abridgment of the statutorily conferred physician-patient privilege in furtherance of a criminal investigation does not implicate a constitutional right so as to warrant suppression. Finally, the prosecutor argued that the second photo array and lineup identifications were attenuated from any CPLR 4504 violation because they resulted from an intervening event, defendant's arrest for weapon possession.

The court, implicitly finding a statutory violation, determined that a breach of the physician-patient privilege does not implicate a constitutional right and that, hence, evidence so obtained need not be suppressed. The court also concluded that the second photo array was not improperly suggestive, noting that Coston viewed two entirely different photographs of defendant in different positions in the two arrays, one taken approximately two years before the other, and he was unable to make an identification in the first array. The court also noted that an examination of the photo arrays reveals that there was a sufficient degree of resemblance among the participants and that none of them had any distinctive features or "stood out." Since the second array was not suggestive, it did not taint the lineup. The court found that the lineup was not itself suggestive because the participants had similar coloring and facial features and there was nothing distinctive about defendant or his clothing. Nor, concluded the court, was there anything to suggest that the witness was given any indication as to which individual to select.

The trial transcript shows that in October 2001, at the Rumba nightclub, Tigerito slashed defendant in a dispute over a woman with whom they had both danced that evening. Jose Ramos, who knew defendant well, observed this altercation. Afterwards, defendant went to the hospital, where he was stitched and bandaged. As a result of the incident at the nightclub, Ramos formulated a plan to kill Tigerito, a drug "boss" who operated around 175th Street and Weeks Avenue, and his "crew" as revenge for the slashing.

At about 9:30 P.M. on October 16, the night of the killing, Luis Lara, a close friend of Tigerito, was walking on Weeks Avenue near 175th Street when he saw a red Ford Expedition "coming upon the block real slow." The driver and sole occupant had a white bandage on his face and wore a white "hoody." Following several cars behind was a gold Toyota Camry with four occupants. Both cars turned right at the corner. As Lara continued

on his way home, he saw Berrios, one of his closest friends, "hanging out" with some girls on the stoop across the street from his building. After a brief chat, Lara went upstairs to his apartment, where he stayed for the remainder of the evening.

That same night, defendant told Ramos that "the people he wanted to kill" were "out there chilling." Thereafter, Ramos, defendant and four or five others, including defendant's brother, Sean, and his uncle, Frank, all clad in "hoodies" and armed with guns, went to the area of Weeks Avenue and 175th Street to find Tigerito and his crew. Their plan was to trap Tigerito and his crew and kill them; Ramos, Frank and others would come down Weeks Avenue from 175th Street, while defendant would come up Weeks Avenue from the Cross-Bronx Expressway. Ultimately, the group drove in two cars, a Toyota Camry and a green Jeep Cherokee, to 175th Street and Weeks Avenue. Ramos and Frank parked the Jeep on Eastburn Avenue and the Cross-Bronx Expressway while defendant, in the Camry with another person, drove up Weeks Avenue from the south. After waiting less than a minute, Ramos and Frank walked up Eastburn Avenue to 175th Street and over to Weeks Avenue, where they proceeded south. After defendant passed Ramos on Weeks Avenue, he warned, "Yo, they got guns man. Be careful." Tigerito and his crew were in the middle of the block.

Ramos fired 10 or 11 shots at Tigerito and his crew, who ran south on Weeks Avenue. As he ran back toward the Jeep, Ramos heard gunshots coming from the bottom of Weeks Avenue. When Ramos arrived back at the Jeep, Sean, from about three feet away, fired two shots at Berrios, who collapsed after being struck in the chest. When Berrios appeared to be getting up, Ramos, from a distance of about 25 feet, "fired three [more] shots at him and he [went] back down."

Coston testified that earlier, at about 1:00 A.M., he had left his Eastburn Avenue apartment and walked east on the Cross-Bronx Expressway service road to the intersection with Weeks Avenue, where he passed by a young black man with an Afro, wearing a beige jacket with a hood over his head, whom he later identified as defendant. Before he reached the next block after Weeks, Coston, hearing gunshots, turned and slowly made his way back toward Weeks Avenue. At the corner of Weeks Avenue and the Cross-Bronx Expressway service road, Coston saw a frightened young Hispanic man with blood in "his stomach area" being pursued down Weeks Avenue by defendant. As he was pursuing the young man, defendant said, "I told you to

stay away from this corner." Assuming a shooting stance, defendant fired shots at the young man, who fell to the ground. During the shooting, Coston viewed defendant for "[m]aybe ten seconds" from a distance of one block. As defendant went back up the street, he asked Coston and a "Spanish couple" if they had seen anything. Coston said he had not.

At about 1:30 that same morning, Lara heard gunshots being fired toward his building from just outside and from 175th Street. He looked out his window facing the street for about three minutes and saw two men, one of whom, wearing a white hoody, he recognized as the man he had seen in the Expedition earlier in the evening. Both men were standing in front of his building and shooting. Lara saw Berrios and others run down the block toward the Cross-Bronx Expressway. After a few minutes, Lara heard more gunshots coming from the expressway. After receiving a phone call, he went outside and, from a distance of approximately 25 feet, saw Berrios's body lying on the sidewalk.

After the shooting, when Ramos asked Sean how he knew that Berrios was an intended victim, Sean replied, "I see my brother trying to get at him; meaning he was trying to hit him." Later that night, when they went to a crack house to dispose of the weapons, defendant told Ramos, "I tried to out him but the kid was too quick."

An autopsy showed that Berrios sustained five gunshot wounds. One bullet, entering his back and perforating his spleen, stomach, liver and heart, was fatal, and another, passing through his abdominal cavity, was "potentially fatal." A third entered his back and lodged in his back muscles, a fourth entered and exited the right wrist, and a fifth entered the left upper arm. The ballistics evidence was consistent with Ramos's testimony that he had fired at Berrios from a distance of about 25 feet and that Sean had fired at him from a distance of about three feet.

After six days of deliberation, the jury acquitted defendant of murder in the second degree under both the intentional and depraved indifference counts, and of manslaughter in the first degree, but convicted him of manslaughter in the second degree. Defendant was sentenced to a term of 5 to 15 years.

■ As to defendant's claim with respect to the information obtained by the police from the administrator at Lincoln Hospital, the physician-patient privilege, which "generally does not extend to information obtained outside the realms of medi-

cal diagnosis and treatment" (*Matter of Grand Jury Investigation in N.Y. County*, 98 NY2d 525, 530 [2002]), was not violated. The privilege is limited to "information acquired by the medical professional 'through the application of professional skill or knowledge' " (*id.*, quoting *Dillenbeck v Hess*, 73 NY2d 278, 284 n 4 [1989]), and "seeks to protect . . . confidential communications, not the mere facts and incidents of a person's medical history" (*Williams v Roosevelt Hosp.*, 66 NY2d 391, 396 [1985]). The privilege "is not intended to prohibit a person from testifying to such ordinary incidents and facts as are plain to the observation of any one without expert or professional knowledge" (*Klein v Prudential Ins. Co. of Am.*, 221 NY 449, 453 [1917]; *People v Hedges*, 98 AD2d 950 [1983], *lv denied* 61 NY2d 909 [1984] [physician's observation that there was a strong odor of alcohol on defendant's breath, that his speech was slurred and disjointed, and that he was extremely intoxicated ruled admissible]).

In response to the question Detective Elliott posed to the Lincoln Hospital administrator as to whether anyone had recently been treated for "any kind of slash wounds to the face," the administrator disclosed the patient's name and address and that the patient had been stitched on the left side of his face. Defendant claims this information was privileged because it revealed the cause of his facial wound, a slashing, and that it was acquired "through the application of professional [medical] skill or knowledge." This is pure hyperbole, belied by the record. Defendant's facial wound, a fresh scar that extended from below his ear almost to his chin, was conspicuous to the average layperson. There was no medical skill or knowledge behind the ascertainment of that information. The hospital administrator's identification of defendant's injury and its location, and that he had received facial stitches, revealed no more than what had been readily observable (*see People v Giordano*, 274 AD2d 748, 750 [2000]).

The facts here are distinguishable from *Matter of Grand Jury Investigation in N.Y. County* (98 NY2d at 529) where disclosure through subpoena was sought of records of male patients, within a specified age range, treated for "a laceration, puncture wound or slash, or other injury caused by or possibly caused by a cutting instrument and/or sharp object" (*id.* at 528). The Court of Appeals held that the subpoenas violated the physician-patient privilege because they called for a medical determination as to causation. In so holding, the Court noted:

"By merely reviewing hospital records after patients obtain emergency medical treatment, hospitals cannot reasonably determine whether particular injuries and their causes would have been obvious to a layperson. Medical records are not organized on the basis of what laypersons—as opposed to medical professionals—might discern. Even if a particular medical record does state the cause of injury, the record may not indicate reliably how the hospital ascertained the cause" (*id.* at 531-532).

Here, there is no issue as to whether the injury at issue was discernible by a layperson. The request identified the nature of the wound, a slash, and its location, the face. Defendant's reliance on *Matter of Grand Jury Investigation of Onondaga County* (59 NY2d 130, 132 [1983]), which involved a broad subpoena requesting information on persons treated for "stab wounds or other wounds caused by a knife," without identifying the specific nature of the wound or its location, is similarly misplaced. In each of these cases, a medical determination was required to frame a response. That is not the case here.

Moreover, even were we to find a violation of the privilege, suppression of the information imparted would not be required. While it is axiomatic that when a defendant's constitutional rights are violated, the fruits of such violation must be suppressed (*Wong Sun v United States*, 371 US 471, 484-485 [1963]), a violation of a statute may be remedied by suppression only if the purpose of the statute is to give effect to a constitutional right (*People v Taylor*, 73 NY2d 683, 690-691 [1989]; *see also People v Patterson*, 78 NY2d 711, 716-717 [1991]).

"At common law, confidential communications between physicians and patients received no protection against disclosure in a legal proceeding" (*Dillenbeck v Hess*, 73 NY2d at 283). In New York, "the first jurisdiction to depart from the common-law rule when it adopted the physician-patient privilege by statute in 1828" (*id.* at 284), "the privilege remains rooted in both the statutory law and public policy" (*id.* at 286). In *Matter of Grand Jury Investigation in N.Y. County* (98 NY2d at 529), the Court of Appeals identified three vital policy objectives underlying the codification of the privilege in CPLR 4504 (a): (1) "to maximize unfettered patient communication with medical professionals, so that any potential embarrassment arising from public disclosure will not 'deter people from seeking medical help and securing adequate diagnosis and treatment,'" (2) to encourage

"medical professionals to be candid in recording confidential information in patient medical records," and (3) to protect "patients' reasonable privacy expectations against disclosure of sensitive personal information" (citations omitted). Although certainly protective of a patient's confidential information, there is nothing in these core objectives "indicating a legislative intent to confer a constitutionally derived 'substantial right', such that the violation of [the] statute, without more, would justify invocation of the exclusionary rule" (*Patterson*, 78 NY2d at 716).

Both the Court of Appeals (*Al-Kanani*, 33 NY2d at 264 n) and this Court (*People v Figueroa*, 173 AD2d 156, 157 [1991], *lv denied* 78 NY2d 1075 [1991]) have noted that the physician-patient privilege is not one of constitutional magnitude. In *Patterson* (78 NY2d at 716), which rejected the claim that the use in a photo array of the defendant's photograph retained in violation of CPL 160.50 implicated substantial constitutional rights and tainted the identification procedure so as to warrant, per se, suppression of any in-court identification testimony by the witness who viewed the improperly retained photograph, the Court of Appeals pointedly noted, in language quite pertinent here, that "the nature of that statutory remedy is unrelated to any Fourth or Fifth Amendment protections" (*id.* at 715; *see also People v Garcia*, 10 AD3d 535 [2004], *lv denied* 3 NY3d 740 [2004] [even if investigatory use of fingerprint without court order violated confidentiality provisions of youthful offender statute, suppression not warranted because statute does not implicate constitutional considerations]). Thus, that one of CPLR 4504's basic objectives is the protection of a patient's privacy expectations is not indicative of a legislative intent to import into the statute the constitutional right to privacy. A statute may be based on privacy considerations and yet not implicate the constitutional right to privacy (*see e.g. id.*).

While, in certain circumstances, federal courts have found confidential medical information to be entitled to constitutional privacy protection (*see e.g. A.L.A. v West Val. City*, 26 F3d 989 [10th Cir 1994]; *Matter of Doe v City of New York*, 15 F3d 264, 267 [2d Cir 1994]), none of these cases held that the admission of evidence obtained in violation of the physician-patient privilege was constitutionally impermissible under the exclusionary rule (*see United States v Morgan*, 2001 WL 1402998, *4-5, 2001 US Dist LEXIS 18522, *11-13 [D Me]).

Nor does the array of New York cases cited by defendant, finding evidence obtained in violation of the physician-patient

privilege inadmissible (*see e.g. People v Sinski,* 88 NY2d 487 [1996]; *People v Strawbridge,* 299 AD2d 584 [2002], *lv denied* 99 NY2d 632 [2003]; *People v Ballard,* 173 AD2d 480 [1991], *lv denied* 78 NY2d 961 [1991]; *People v Petro,* 122 AD2d 309 [1986]), support his position on this point. None involved suppression under the Fourth Amendment exclusionary rule. Although *Petro* is couched in terms of "suppression of [blood] test results" (*id.* at 310), all of the cases involved an evidentiary question as to the admissibility at trial of medical evidence in the face of the assertion of the physician-patient privilege.

In any event, even if both the information from Lincoln Hospital and the identifications should have been suppressed, any error in their admission was harmless. The evidence of defendant's guilt, consisting of in-court eyewitness identifications of defendant as one of the shooters, testimony by one of the eyewitnesses as to the motive for the shooting and defendant's major role in preparing for it, testimony corroborating the accounts of the shooting and the events preceding it, and the additional confirmatory police, ballistics and medical evidence, was overwhelming. Thus, the admission of Detective Elliott's testimony that defendant was treated at Lincoln Hospital for a slash wound, as well as his and Coston's testimony about the lineup identification, even if erroneous, could not have affected the verdict and was harmless beyond a reasonable doubt (*People v Crimmins,* 36 NY2d 230, 242 [1975]; *see People v Mack,* 300 AD2d 254, 255 [2002], *lv denied* 100 NY2d 540 [2003]).

In support of his argument that the verdict was against the weight of the evidence, defendant mounts a series of credibility attacks against the two eyewitnesses, Jose Ramos and Tony Coston, and the corroborating witness, Luis Lara. Coston, an electrician with an untarnished past and no motive to accuse defendant falsely, testified that he saw defendant, under "pretty good" lighting conditions, chase and shoot at Berrios while admonishing the victim that he had "told [him] to stay away from this corner." Coston had three different occasions to observe defendant that night—before, during and after the shooting. Four days after the shooting, he picked defendant out of a lineup as "most definitely" the person who shot at Berrios.

Coston's account was confirmed by Ramos, who explained defendant's motive for the shooting and placed him at the scene with a gun. He described how he, defendant and others planned the shooting, how defendant drove up Weeks Avenue and, upon passing Ramos, warned that Tigerito and his crew had guns,

and how he heard gunshots coming from the bottom of Weeks Avenue, the same location where Coston said he had seen defendant shoot at Berrios. Significantly, Ramos testified that just after the shooting, defendant said he had "tried to out [Berrios] but the kid was too quick."

■ Lara's testimony confirmed the testimony of Coston and Ramos. He testified that at about 9:30 on the night of the shooting, he observed a red Ford Expedition, driven by a brown-skinned man with a bandaged face wearing a hoody, proceeding slowly up Weeks Avenue, thereby confirming Ramos's testimony that defendant owned a burgundy Expedition. Lara's testimony that he saw a gold Toyota Camry occupied by four men with black hoodies coming slowly up the block a few cars behind the Expedition corroborated the description of that car by Ramos and Coston and Ramos's testimony that all the participants in the shooting wore hoodies. Lara's testimony of hearing gunshots from just outside his building and from 175th Street, then seeing the Expedition driver shoot at his building as Berrios and others ran toward the Cross-Bronx Expressway and, minutes later, hearing gunshots from the expressway, also confirmed the testimony of Ramos and Coston. Given such an array of credible, substantiated evidence of guilt, a different finding would have been unreasonable (*see People v Bleakley*, 69 NY2d 490, 495 [1987]).

Defendant argues that Ramos, a 24-year-old multiple felon and drug boss in his Bronx neighborhood around 168th Street and College Avenue, who, as he put it, loved defendant "like a brother" and was only testifying against him to avoid prison time, had an "incredible incentive to fabricate [defendant's] involvement in the shooting." Given the detailed nature of Ramos's testimony about the shooting and the considerable evidence corroborating it, there is no reason to disturb the jury's determination (*see People v Lewis*, 3 AD3d 402 [2004], *lv denied* 1 NY3d 630 [2004]).

As for Coston's credibility, defendant stresses that Ramos never saw him shoot at Berrios, while he did see defendant's brother, Sean, do so, and that Coston's testimony that Berrios fell after defendant shot at him is thereby refuted. Ramos, however, did testify that he heard shots coming from the bottom of Weeks Avenue as he rounded Eastburn Avenue. A fair inference is that these shots were fired by defendant. Consistent with that account, and given that this segment of the entire episode lasted only 15 seconds, Sean may have shot at Berrios

immediately after defendant did, and Coston may have been witnessing Berrios's fall as a result of Sean's gunshots. The additional shots he heard later would have been those fired by Ramos. Alternatively, Berrios may have fallen after defendant shot at him, gotten back up and continued running on the Cross-Bronx Expressway service road, and then fallen again after being shot by Sean.

Defendant's challenge to Lara's credibility is limited to two minor inconsistencies between the latter's testimony and that of other witnesses. Lara testified that the driver of the Expedition wore a white hoody, while Ramos and Coston testified that no one wore a white hoody. In fact, Coston testified that the driver of the Expedition wore a tan hoody, which is not that much different from white, and far more incriminatory than exculpatory. The other asserted inconsistency, as to the location of Berrios's body after the shooting, is not an inconsistency at all.

Defendant argues that the lineup identification by Coston should have been suppressed because it was unduly suggestive, defendant having appeared significantly younger than any of the other men in the lineup. This claim is unpreserved and, in any event, without merit. Examination of the lineup photograph reveals that contrary to defendant's contention, none of the participants, including defendant, stands out from the others in terms of age or otherwise. When asked to describe the men in the lineup, he testified: "It was all young black males." "There is no requirement . . . that a defendant in a lineup be surrounded by people nearly identical in appearance" (*People v Chipp*, 75 NY2d 327, 336 [1990], *cert denied* 498 US 833 [1990]).

Defendant also argues that the lineup was tainted by the unduly suggestive second photo array, which did not include the second person Coston had recognized in the first photo array, and that the in-court identification was tainted by this factor as well as defendant's relative youth compared to the other men in the lineup. This claim is meritless. In the first array, displayed in a police vehicle with "pretty bad" lighting conditions in the dark early morning hours, Coston viewed a black and white photograph of defendant, several years old. Although indicating recognition of defendant and another person, Coston "wasn't too sure" and "didn't want to say yes or no." Instead, Coston asked to see a more recent photograph or a live person under better lighting conditions. Thus, in reality, Coston did not identify anyone in the first photo array.

In the second array, displayed three days later at his home, Coston viewed a color photograph of defendant taken the day before and identified him immediately. Defendant's photograph was in a different position from the one included in the first array. While "the inclusion of a single suspect's photograph in successive arrays is not a practice to be encouraged, it does not per se invalidate the identification procedures" (*People v Gilbert*, 295 AD2d 275, 276 [2002], *lv denied* 99 NY2d 558 [2002]). The procedure is suggestive only when the witness is repeatedly subjected to the same image of the defendant (*People v Jones*, 171 AD2d 757, 758 [1991]).

The procedure employed here was not suggestive. The photographs of defendant in the two arrays differed, the one in the first array being about two years older than the one in the second (*see e.g. People v Quinones*, 228 AD2d 796, 797 [1996] [display of two different photographs of defendant in successive arrays two weeks apart did not render identification unduly suggestive]) and was black and white, while the photograph in the second was in color. Defendant's photographs were in different positions in the two arrays (*see e.g. People v Dunlap*, 9 AD3d 434, 435 [2004], *lv denied* 3 NY3d 739 [2004]). This is not like the cases cited by defendant where identical photographs were included in successive arrays displayed in quick succession (*see e.g. People v Hall*, 81 AD2d 644 [1981]; *People v Tindal*, 69 AD2d 58 [1979]). Thus, the lineup and in-court identifications were properly admitted in evidence.

■ Defendant also challenges the court's *Sandoval* ruling, which, while otherwise highly favorable to defendant in that it only permitted elicitation of unspecified felonies, constituted an improvident exercise of discretion in allowing inquiry into the location—168th Street and College or Findlay Avenue—where those prior arrests had occurred. The location of defendant's prior crimes had no probative value with respect to credibility, absent some special circumstance that might have opened the door to its admission. The error, however, was harmless.

We perceive no basis for reducing the sentence.

Accordingly, the judgment of the Supreme Court, Bronx County (Troy K. Webber, J.), rendered April 1, 2004, convicting defendant, after a jury trial, of manslaughter in the second degree and sentencing him to a term of 5 to 15 years, should be affirmed.

WILLIAMS, GONZALEZ, CATTERSON and McGUIRE, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered April 1, 2004, affirmed.