[847 NYS2d 654]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v FRITZ ELYSEE, Appellant.

Second Department, December 18, 2007

34

**APPEARANCES OF COUNSEL**

*Lynn W. L. Fahey,* New York City (*Katherine R. Schaefer* and *Warren S. Landau* of counsel), for appellant.

*Charles J. Hynes, District Attorney,* Brooklyn (*Leonard Joblove* and *Diane R. Eisner* of counsel), for respondent.

**OPINION OF THE COURT**

SKELOS, J.

Today we hold that a physical blood specimen taken from a patient by a medical professional is not "information" protected by the physician-patient privilege as defined in CPLR 4504 (a) and, accordingly, such a blood sample is subject to seizure pursuant to a warrant issued under the authority of CPL 690.10.

On December 25, 2003, at approximately 4:20 A.M., Seon Andrews was killed, and several other people were injured, in a four-vehicle accident at the intersection of Nostrand Avenue (hereinafter Nostrand) and Atlantic Avenue (hereinafter Atlantic) in Brooklyn. Immediately before the accident, the defendant drove a Nissan Maxima automobile (hereinafter the defendant's vehicle) from a side street onto Nostrand, almost striking the side of another vehicle that was proceeding southbound on Nostrand (hereinafter the witness's car). The defendant's vehicle almost caused an accident between the witness's car and an oncoming car in the northbound lane. The witness "dropp[ed]" his car back so that the defendant's vehicle could proceed ahead of him. The witness observed the defen-

dant's vehicle, which was traveling at "a fair amount of speed," go straight through the red light at the intersection of Nostrand and Atlantic and strike a pickup truck. The defendant's vehicle did not slow down as it entered the intersection and the witness did not observe the brake lights of the defendant's vehicle come on at any point before the accident. The defendant's vehicle hit the pickup truck with such force that the truck was propelled into a steel beam supporting the elevated railroad tracks.

A firefighter with the New York City Fire Department responded to the accident. He testified that as he approached the defendant's vehicle and reached inside to ensure that the ignition was turned off, he "noticed a strong smell of alcohol" in the car and on the defendant's breath. The firefighter also testified that when he and a police officer of the New York City Police Department (hereinafter the NYPD) approached the defendant's vehicle and offered to assist the defendant, the defendant repeatedly cursed at them and threatened to spit on the police officer. The firefighter stated that the defendant was "belligerent [and] confrontational."

Three NYPD officers responded to the accident. They also testified that the defendant appeared to be intoxicated because he had the odor of "alcohol on his breath and he was acting a little irrational," had slurred speech, and walked with a stagger. One of the officers also testified that the defendant was "belligerent. He was acting up. He was cursing, what he was saying word-for-word, I can't really remember, but he was really acting up." In addition, the paramedic who responded to the accident testified that the defendant appeared "very agitated, he was uncooperative, he was cursing at the police officer," and was refusing medical treatment. According to the paramedic, the defendant seemed incoherent. The first thing the paramedic noticed was alcohol on the defendant's breath. An emergency room physician also testified that during his encounter with the defendant, the defendant seemed intoxicated based upon the way he was acting and the noticeable smell of alcohol coming from the defendant.

The NYPD obtained two sets of samples of the defendant's blood and forwarded them to Dr. Elizabeth Marker, a forensic toxicologist employed by the New York City Office of the Chief Medical Examiner, to determine the defendant's blood alcohol level at the time of the accident. The samples at issue on this appeal were comprised of hospital blood specimens seized upon the execution of a search warrant issued pursuant to CPL

690.10 (hereinafter the search warrant blood samples) five days after the accident. The search warrant blood samples were obtained from blood specimens drawn from the defendant by a second-year medical resident working in the emergency room at approximately 5:30 A.M. on December 25, 2003, immediately upon the defendant's arrival at the hospital after the accident. The resident testified that it was the hospital's practice to place all trauma victims in a special area of the emergency room where hospital personnel would start an intravenous line through which blood would be drawn.

The other set of blood samples was obtained through a court order issued pursuant to Vehicle and Traffic Law § 1194 (hereinafter the VTL samples). The VTL samples were drawn from the defendant by a registered nurse in the presence of an NYPD police officer on December 25, 2003, at approximately 2:50 P.M.

Dr. Marker testified that the VTL samples came into her possession on December 26, 2003, and revealed that the defendant's blood alcohol "concentration was .05 gram percent." Dr. Marker opined that it is scientifically possible, through reverse extrapolation, to reliably determine what a person's blood alcohol content was at an earlier time based upon a later blood alcohol content test when certain assumptions are made. Dr. Marker testified that, assuming that the alcohol in the defendant's system was fully absorbed at the time of the accident, going back a period of 10 hours from the time the blood samples were taken at 2:50 P.M., the defendant's blood alcohol level range at the time of the accident would have been "between .20 [gram] percent and .25 [gram] percent." Dr. Marker also testified that to have a blood alcohol content in that range, a person would have consumed "a minimum of ten drinks and probably more."

Dr. Marker further testified that the two search warrant blood samples she tested that were drawn by the medical resident immediately after the accident revealed a blood alcohol concentration of .23 gram percent and .21 gram percent, respectively. Dr. Marker opined that these results were consistent with, and substantiated, the results of the reverse extrapolation analysis of the VTL samples.

Prior to trial, the defendant moved, inter alia, to controvert the search warrant and to suppress the results of the blood alcohol test performed on the search warrant blood samples on the ground that, among other things, the seizure of his blood pursuant to CPL 690.10 violated the physician-patient privilege defined by CPLR 4504. The motion court, among other things,

denied that branch of the motion which was to controvert the search warrant. The court found that the facts alleged in the search warrant application were sufficient to establish probable cause to believe that the defendant was operating a motor vehicle while under the influence of alcohol. The motion court also denied that branch of the motion which was to suppress the results of the blood alcohol test performed on the search warrant blood samples, upon determining that CPLR 4504 "has no application to vials of blood, which were the objects of the search warrant."

Contrary to the defendant's contention, neither the seizure pursuant to CPL 690.10 of the search warrant blood samples that were drawn at the hospital nor the admission of the results of the blood alcohol test performed by the Medical Examiner on those samples violated the physician-patient privilege.

Pursuant to CPLR 4504 (a): "a person authorized to practice medicine, registered professional nursing, licensed practical nursing, dentistry, podiatry or chiropractic shall not be allowed to disclose any *information* which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity" (emphasis added).

The physician-patient privilege contained in CPLR 4504 (a) "is entirely a creature of statute" (*Dillenbeck v Hess*, 73 NY2d 278, 283 [1989], citing Fisch, New York Evidence § 541 [2d ed]; McCormick, Evidence § 98 [3d ed]; *Williams v Roosevelt Hosp.*, 66 NY2d 391, 395 [1985]; *Koump v Smith*, 25 NY2d 287, 293 [1969]). "In 1828, New York became the first state to abrogate the common law rule that physicians could be compelled to disclose information acquired while treating their patients" (Prince, Richardson on Evidence § 5-301 [Farrell 11th ed]; *see* 2 Rev Stat of NY, part III, ch VII, tit III, § 73 [1st ed 1829]; *see also Matter of Grand Jury Investigation in N.Y. County*, 98 NY2d 525, 529 [2002]). At issue in this case, and what is an issue of first impression in this Court, is whether the term "information," as used in CPLR 4504 (a), should be construed to include a physical blood sample drawn from a patient by a physician or other medical professional defined in the statute. In our view, such an interpretation would constitute an expansion of the privilege neither contemplated nor intended by the Legislature.

Webster's Dictionary defines "information" first as "the communication or reception of knowledge" and second as "something received or obtained through informing: as a: knowledge communicated by others or obtained from investigation, study,

or instruction" (Webster's Third New International Dictionary 1160 [2002]). The plain meaning of the term "information" neither expressly nor implicitly encompasses the source from which the information is derived or, as is pertinent here, the physical evidence. Rather, it refers to that which is conveyed or learned through a communication or observation.

Traditionally, in interpreting CPLR 4504 (a), the courts of this state have construed the phrase *"information . . .* acquired in attending a patient in a professional capacity" (emphasis added) to mean "communications" from the patient or from "others who may surround him [or her] at the time" (*Edington v Mutual Life Ins. Co. of N.Y.*, 67 NY 185, 194 [1876]; *see* 2 Rev Stat of NY, part III, ch VII, tit III, § 73 [1st ed 1829]). In addition, the term "information" in the context of the physician-patient privilege has been construed from the time of its earliest usage through the present as applicable "not only [to] communications received from the lips of the patient but such knowledge as may be acquired from the patient himself, from the statement of others who may surround him at the time, or from observation of his appearance and symptoms" (*Edington v Mutual Life Ins. Co. of N.Y.*, 67 NY at 194; *see Hughson v St. Francis Hosp. of Port Jervis*, 93 AD2d 491, 498 [1983]), "unless the facts observed would be obvious to lay[persons]" (*Dillenbeck v Hess*, 73 NY2d at 284, quoting Fisch, New York Evidence § 544, at 361 [2d ed], citing 5 Weinstein-Korn-Miller, NY Civ Prac ¶ 4504.08; *Edington v Mutual Life Ins. Co. of N.Y.*, 67 NY 185 [1876]; *Matter of Coddington*, 307 NY 181, 193 [1954]). Thus, the privilege has been construed to protect information obtained by the physician whether such information was communicated by the patient to the physician or through the physician's observations of the patient (*see generally Dillenbeck v Hess*, 73 NY2d 278 [1989]; *Klein v Prudential Ins. Co. of Am.*, 221 NY 449, 453 [1917]).

The information protected also includes the nature of the treatment rendered and the resultant diagnosis, but not the mere "facts and incidents" of the patient's medical history or the fact that treatment was rendered (*Williams v Roosevelt Hosp.*, 66 NY2d 391, 396 [1985]; *see Hughson v St. Francis Hosp. of Port Jervis*, 93 AD2d at 499; *Patten v United Life & Acc. Ins. Assn.*, 133 NY 450, 453 [1892]). For example, questions such as those designed to elicit information as to whether the patient had been previously treated at a hospital or by a doctor are not protected against by the physician-patient privilege, "as

long as such questions are not disguised attempts to elicit the nature of the disease or condition for which [he or] she was treated" (*Hughson v St. Francis Hosp. of Port Jervis*, 93 AD2d at 499). On the other hand, a medical provider's diagnosis, which involves the professional skill and judgment of the provider, made after evaluating a patient's condition and interpreting certain test results, is privileged (*see Hughson v St. Francis Hosp. of Port Jervis*, 93 AD2d 491 [1983]; *see generally Matter of Grand Jury Subpoena Duces Tecum Dated Dec. 14, 1984*, 69 NY2d 232, 241 [1987], *cert denied* 482 US 928 [1987]). So too, are the actual test results privileged (*see People v Petro*, 122 AD2d 309, 310 [1986]). Viewed in that context, however, a physical blood sample standing alone, prior to being tested by the treating physician or other medical professional, is not similarly protected since it neither communicates nor renders observable any information about a patient upon which treatment can be based or a diagnosis made (*see generally Matter of Grand Jury Investigation of Onondaga County*, 59 NY2d 130, 134 [1983]).

The Court of Appeals has held that "hospital *records* relating to [a] defendant's physical *condition* and blood alcohol *content* following [an] accident—indisputably falls within the scope of the physician-patient privilege as information acquired by a physician 'in attending [defendant] in a professional capacity, and which was necessary to enable him to act in that capacity' (CPLR 4504)" (*Dillenbeck v Hess*, 73 NY2d at 289 [emphasis added]; *see e.g. Navedo v Nichols*, 233 AD2d 378, 379 [1996]; *but see e.g. State v Dyal*, 97 NJ 229, 232, 478 A2d 390, 391 [1984] [determining that the People can obtain blood test results protected by the physician-patient privilege upon issuance of a valid subpoena duces tecum upon a showing that they have a reasonable basis to believe the defendant was operating a motor vehicle while under the influence]; *State v Howard*, 272 NC 519, 520-521, 158 SE2d 350, 350 [1968] [physician's evidence taken out of the privileged communication rule provided in North Carolina General Statutes § 8-53 because it was necessary to a proper administration of justice]; *Garcia v State*, 95 SW3d 522, 526 [Tex 2002] [statutory physician-patient privilege does not protect the record of blood test results of an injured motorist from being given to law enforcement officials pursuant to a grand jury subpoena]; *State v Cooper*, 1997 WL 543055, *2, 1997 Ohio App LEXIS 38000, *5 [6th App Dist 1997] [Ohio Revised Code Annotated § 2317.02 excepts from the physician-patient privilege the results of a

blood alcohol test taken at any time relevant to a criminal offense]). Thus, even to the extent that the privilege protects documents, such as a patient's medical records (*see generally Boddy v Parker*, 45 AD2d 1000, 1001 [1974]), which may be based largely on communications imparted by the patient to the medical professional in an attempt to obtain treatment, such protection does not extend to the facts and incidents of the person's medical history upon which such records were based (*see Williams v Roosevelt Hosp.*, 66 NY2d at 396; *Klein v Prudential Ins. Co. of Am.*, 221 NY at 453; *cf. Upjohn Co. v United States*, 449 US 383 [1981] [protection of the attorney-client privilege extends only to communications, not to facts]).

Moreover, in our opinion, the *physical blood sample* drawn by a health-care provider enjoys no such protection. Indeed, to expand the use of the privilege to protect patients' physical blood samples would defeat the purpose of legislation expressly enacted to compel a motorist to provide a blood sample by court order (*see e.g.* Vehicle and Traffic Law § 1194; CPL 240.40 [2] [b] [v]; *People v Moselle*, 57 NY2d 97, 110 [1982]) or search warrant (*see* CPL 690.10; *People v Casadei*, 66 NY2d 846 [1985]).

As is relevant here, pursuant to CPL 690.10, "[p]ersonal property is subject to seizure pursuant to a search warrant if there is reasonable cause to believe that it . . . [c]onstitutes evidence or tends to demonstrate that an offense was committed" (*see generally Matter of Abe A.*, 56 NY2d 288, 294 [1982]; *People v King*, 232 AD2d 111, 116 [1997]). It would be an incongruous result to allow the issuance of a valid search warrant pursuant to CPL 690.10 (4) to compel a person to provide a blood sample upon a showing of reasonable cause that it constitutes evidence that an offense was committed, to wit, a violation of Vehicle and Traffic Law § 1192, but to disallow the People from seizing and using a previously drawn, and more reliable, blood sample (*see generally Schmerber v California*, 384 US 757, 770-771 [1966]; *People v Atkins*, 85 NY2d 1007, 1009-1010 [1995, Simons, J., dissenting]), upon the same evidentiary proof.

In an analogous circumstance, this Court has previously held that it was neither unreasonable nor impermissible to have used a defendant's blood sample, which had been legally seized from his person in connection with one crime, in another unrelated police investigation (*see People v King*, 232 AD2d at 117). This Court opined that "[p]rivacy concerns are no longer relevant once the sample has already lawfully been removed from the body, and the scientific analysis of a sample does not involve

any further search and seizure of a defendant's person" (*id.* at 117-118). In so stating, this Court, in comparing a lawfully-obtained blood sample to other examples of tangible property, i.e., a gun and a controlled substance, reasoned that "[a]lthough human blood, with its unique genetic properties, may initially be qualitatively different from [other tangible property used as evidence], once constitutional concerns have been satisfied, a blood sample is not unlike other tangible property which can be subject to a battery of scientific tests" (*id.* at 118).

This case is distinguishable from circumstances where a blood sample was obtained without a warrant. Yet, even in such cases, the compulsory taking of blood has passed constitutional scrutiny where the requisite showing of probable cause was made, there was due consideration for the reliability of the blood evidence and its potential dissipation with the passage of time, and the means and procedures employed were reasonable in that the test was performed by a physician in a hospital according to accepted medical practices (*see e.g. Schmerber v California*, 384 US at 770-772).

Here, where the blood samples were seized pursuant to a valid search warrant issued by the Supreme Court upon a showing by the People of reasonable cause, the defendant's constitutional rights were safeguarded (*id.* at 772). Moreover, "[i]t is clear that a search warrant [based upon a showing of probable cause] may validly be issued to obtain a blood sample in the event of a violation of the Penal Law" (*People v Casadei*, 66 NY2d 846, 848 [1985], citing *Matter of Abe A.*, 56 NY2d 288 [1982]; *see People v Goodell*, 164 AD2d 321, 326 [1990], *affd* 79 NY2d 869 [1992]; *People v McGrath*, 135 AD2d 60, 63-64 [1988], *affd* 73 NY2d 826 [1988]), just as a warrant may validly be issued to seize any other physical evidence demonstrating the commission of a crime (*see* CPL 690.10).

Previously, the Court of Appeals has held that blood samples may only be taken either on consent of the driver pursuant to the terms of Vehicle and Traffic Law former § 1194 (1) and (2), by court order pursuant to CPL 240.40 (2) (b) (v) after an indictment or information had been filed, or by a search warrant in accordance with the test laid out in *Matter of Abe A.* (56 NY2d 288 [1982]), in effect, pursuant to CPL 690.10 (*see People v Moselle*, 57 NY2d 97 [1982]). In *People v Moselle*, the Court of Appeals limited the methods pursuant to which chemical tests for determining blood alcohol content may be administered. The Court of Appeals held that Vehicle and Traffic Law former

§ 1194 was the only method permitted by the Legislature for the administration of such tests with respect to violations of Vehicle and Traffic Law former § 1192 (*see People v Moselle*, 57 NY2d 97 [1982]). In addition, with respect to other criminal investigations, the Court of Appeals opined that CPL 240.40 (2) (b) (v) and, implicitly by the Court's reference to *Matter of Abe A.* (56 NY2d 288 [1982]), CPL 690.10 were the exclusive means of authorizing blood tests (*see People v Moselle*, 57 NY2d 97 [1982]).

As this Court previously opined, "[t]hese restrictions seriously impeded the utilization of blood tests where there was an accident involving death or serious injury. Moreover, due to the very nature of the test (i.e., to detect the presence of alcohol in the blood), the element of time was highly significant, for the longer it took to obtain the blood sample, the greater the likelihood that the percentage of alcohol in the blood would diminish" (*People v Whelan*, 165 AD2d 313, 318 [1991]). Thus, the Legislature enacted Vehicle and Traffic Law former § 1194-a (L 1983, ch 481), now Vehicle and Traffic Law § 1194 (3), permitting an ex parte application for an order compelling the operator of a motor vehicle to submit to a chemical test of his or her blood under certain prescribed circumstances (*see* Vehicle and Traffic Law § 1194 [3] [b] [1]-[4]; *People v Casadei*, 66 NY2d 846 [1985]).

Moreover, the Court of Appeals subsequently rejected its holding in *People v Moselle* (57 NY2d 97 [1982]), which required separate resort to Vehicle and Traffic Law § 1194 to sustain a Vehicle and Traffic Law offense that is part of the same indictment as a Penal Law violation (*see People v Casadei*, 66 NY2d at 848). Notably, in *People v Casadei*, the Court of Appeals also reaffirmed the use of a validly issued search warrant to obtain a blood sample in the event of a violation of the Penal Law (*see People v Casadei*, 66 NY2d 846 [1985]; *Matter of Abe A.*, 56 NY2d 288 [1982]). Thus, the evolution of the relevant body of law governing the obtaining of blood samples to be used in the prosecution of cases involving a motorist suspected or charged with driving while intoxicated or impaired evidences an intent to facilitate the State's ability to obtain this evidence.

The cases in which the Court of Appeals has held that the physician-patient privilege is implicated have involved the protection of the results of a blood alcohol test conducted by the medical provider and recorded in the patient's records maintained by the medical provider (*see e.g. Dillenbeck v Hess*, 73

NY2d at 282; *cf. People v Petro*, 122 AD2d at 309), not, as the People in the case at bar sought, the physical blood sample. Contrary to the conclusion reached by the District Court in Nassau County, this is not "a distinction without a difference" (*People v Muscarnera*, 16 Misc 3d 622, 633 [2007] [ruling that the results of a blood test performed by the People on a blood sample drawn by an ambulance emergency technician acting in a professional capacity to treat and diagnose the patient were inadmissible at trial on the basis of the physician-patient privilege]; *see People v Bashkatov*, 13 Misc 3d 1101, 1104 [2006] [same]; *but see People v Bolson*, 183 Misc 2d 155, 160 [1999] ["seizure of the blood samples simply does not impinge upon or seek to pierce the physician-patient privilege"]), particularly where the blood alcohol test was not performed by the defendant's medical provider. Nor does making such a distinction render CPLR 4504 (a) meaningless (*see People v Bashkatov*, 13 Misc 3d at 1104), as the intent of the statute to protect "communications" is not diminished by a refusal to extend its application to that which it was not intended to protect in the first instance.

In determining that the physician-patient privilege does not apply to the actual blood sample itself, we are cognizant of the three core policy objectives of CPLR 4504 (a), namely, (1) maximizing unfettered patient communication with medical professionals, so as not to deter people from seeking medical help and securing adequate diagnosis and treatment, (2) encouraging medical professionals to be candid in recording confidential information in patient medical records, and (3) protecting patients' reasonable privacy expectations against disclosure of sensitive personal information (*see Matter of Grand Jury Investigation in N.Y. County*, 98 NY2d at 529; *Steinberg v New York Life Ins. Co.*, 263 NY 45, 48-49 [1933]). Here, the defendant argues that "the public policy of fostering adequate medical treatment would not be advanced if patients were dissuaded from providing blood samples to their doctors because they would not be deemed confidential information protected by the doctor-patient privilege."

As to the first policy objective, i.e., not to deter a patient from seeking medical attention, as is discussed more fully, infra, there is no real value in applying the privilege for that purpose here. Since the police may, in the absence of consent, obtain a court order compelling the motorist to have his or her blood drawn, pursuant to Vehicle and Traffic Law § 1194 (3), that policy objec-

tive, in the context of a prosecution pursuant to Vehicle and Traffic Law § 1192, is purely illusory. As to the second policy objective, i.e., to encourage medical professionals to be candid in recording confidential information in patient medical records: here, providing the State with the actual blood sample would have no effect on the medical professionals' candidness in such recording since the blood alcohol test was not performed by the defendant's medical provider and thus the defendant's actual medical records were not sought. We note in this regard that we continue to recognize that the results of tests performed by a medical professional in the course of diagnosis and treatment and recorded in the defendant's medical records are protected by the physician-patient privilege (see People v Petro, 122 AD2d at 310). Lastly, as to the third policy objective, i.e., protecting patients' reasonable privacy expectations against disclosure of sensitive personal information, assuming arguendo that such goal is applicable not just to the record containing the medical determination (see Matter of Grand Jury Investigation in N.Y. County, 98 NY2d at 532-533), but to the physical blood sample itself, if constitutional safeguards have been met prior to the seizure of the sample, a patient may not assert a privacy claim so as to warrant suppression of the evidence (see Schmerber v California, 384 US at 770-772; People v Greene, 36 AD3d 219, 228 [2006], affd 9 NY3d 277 [2007]).

Moreover, any extension of the privilege from protecting communicative information or other information obtained by the physician for the purpose of medical treatment, i.e., the blood test result, to protecting the physical blood sample itself would have the undesirable result of contravening other overriding public policy interests. The Legislature has clearly expressed its interest in promoting the goal of public safety by enacting legislation providing for compulsory chemical tests to facilitate the prosecution of intoxicated or impaired drivers whose actions result in serious injury or death (Approval Mem filed with 1983 NY Assembly Bill 4178-B [July 15, 1983], amending Vehicle and Traffic Law §§ 1194, 1195 and CPL 240.40, 710.20, and adding Vehicle and Traffic Law § 1194-a). As stated by the late Senator Norman J. Levy, a former chairman of the Senate Committee on Transportation, upon urging Governor Cuomo to sign the proposed legislation into law, "[i]t will continue the legislative policy of the State regarding getting tough with those drivers who drink and drive" (Letter from NY Senate Comm on Transp, June 25, 1983, Bill Jacket, L 1983, ch 481, at 9). Clearly, it

has been the goal of the Legislature to facilitate, not impede, the prosecution of cases involving serious car accidents caused by impaired or intoxicated drivers.

The courts of this State also have long and repeatedly acknowledged the strong interest this State has in removing intoxicated drivers from its highways (*see e.g. People v Scott*, 63 NY2d 518, 525 [1984] [determining that the use of a temporary roadblock to detect and deter drunk drivers was constitutionally permissible]; *People v Ward*, 307 NY 73, 76 [1954] [holding that Vehicle and Traffic Law former § 71-a did not require the police officer to advise the "suspected inebriate," who voluntarily submitted to a chemical test, that he had the option of refusing and having his license revoked]; *People v Chaffee*, 183 AD2d 208, 210 [1992] [checkpoint procedure is a sufficiently productive mechanism that balances the privacy interests of a motorist against the legitimate governmental interests in controlling drunk driving]; *People v Odenweller*, 137 AD2d 15, 18 [1988] [upholding warrantless entry by police officer into residence of fleeing driver, subsequent arrest, and admission of blood sample on the ground, inter alia, that a delay in obtaining the blood sample would have seriously impaired important evidence]; *Matter of Quealy v Passidomo*, 124 AD2d 955, 956-957 [1986] [upholding interpretation of Vehicle and Traffic Law former § 510 [6] [a] prohibiting Commissioner of Motor Vehicles from restoring the license of a driver who was twice convicted of driving a motor vehicle while intoxicated where personal injury was involved, even though second accident was a one-car accident in which only that driver was injured]).

The means for obtaining blood samples in these cases are varied and nonexclusive (*see People v Casadei*, 66 NY2d 846 [1985]; *Matter of Abe A.*, 56 NY2d 288 [1982]; *People v Mills*, 124 AD2d 600, 601 [1986]), thereby fostering the goals of law enforcement and public safety while maintaining certain procedural safeguards that balance the State's interest in obtaining the necessary evidence against the constitutional rights of the individual. Even a blood sample taken from an unconscious motorist incapable of giving his consent has been deemed to have been validly taken without offending the motorist's constitutional rights (*see People v Dixon*, 149 AD2d 75, 79 [1989]). In *People v Dixon*, this Court determined that the results of a blood test conducted on an unconscious defendant pursuant to Vehicle and Traffic Law § 1194 were admissible at trial with respect to not only the Vehicle and Traffic

Law violations but also the charges under the Penal Law arising from the same incident (*see People v Dixon,* 149 AD2d at 79). In so holding, this Court reasoned that the blood sample was material, relevant, and competent because it was obtained in complete conformity with applicable statutory authority and there was no constitutional bar precluding the State from compelling the motorist to submit to a blood test under the circumstances presented (*id.* at 80).

Vehicle and Traffic Law § 1194 (1) (b) provides that a motorist shall be deemed to have given his or her consent to a compulsory blood test. The Court of Appeals, in interpreting Vehicle and Traffic Law former § 1194 as not requiring the consent of a motorist, who appeared to be incapable of giving his consent by reason of intoxication, to the drawing of his blood, reasoned that to require consent would render the statute meaningless as to the unconscious or incapacitated driver because of the impossibility of obtaining his or her consent (*see People v Kates,* 53 NY2d 591, 595-596 [1981]). Moreover, the Court of Appeals noted that the Legislature reasoned that this provision was no less applicable to an unconscious individual than a conscious individual " 'since he is deemed to have given his consent when he used the highway' " (*id.,* quoting Rep of Joint Legis Comm on Motor Veh Problems, 1953 McKinney's Session Laws of NY, at 1928). Similarly, it would have an anomalous result if the Legislature, which provided for compulsory blood testing as a means to address the scourge of drunk driving and aid in the prosecution of drunk drivers, would have intended that blood already drawn from such person for medical purposes could not, by application of the physician-patient privilege, be seized pursuant to a validly issued search warrant pursuant to CPL 690.10.

Indeed, unlike *People v Moselle,* this is not a case where a court order was not obtained before the defendant was forced to provide a blood sample (*see e.g. People v Moselle,* 57 NY2d 97 [1982]; *compare Schmerber v California,* 384 US at 770). Rather, the NYPD obtained a valid search warrant pursuant to CPL 690.10. It is incongruous that a search warrant that would have been valid to compel the defendant to have blood drawn directly from his person, an act that unquestionably invokes concerns of constitutional proportion (*see generally Schmerber v California,* 384 US at 770), would be deemed invalid to seize the blood sample already obtained, under the guise of a mere statutory privilege in derogation of the common law that is not of

constitutional magnitude (*see generally People v Al-Kanani*, 33 NY2d 260, 264 [1973], *cert denied* 417 US 916 [1974]; *People v Greene*, 36 AD3d 219 [2006]). Thus, even if admission of the evidence obtained pursuant to the CPL 690.10 search warrant implicated the physician-patient statutory privilege, which we conclude it did not, its admission does not implicate constitutional considerations and, therefore, does not warrant suppression (*see People v Greene*, 36 AD3d at 228-229; *see generally People v Al-Kanani*, 33 NY2d 260 [1973]; *cf. People v Patterson*, 78 NY2d 711, 715-717 [1991]).

That an intoxicated driver might, as the defendant suggests, oppose medical treatment for fear that the drawing of his or her blood will provide evidence of intoxication is a superficial risk. Nevertheless, it warrants exploration. Given the various statutory means by which the State may obtain a driver's blood sample (*see e.g.* Vehicle and Traffic Law § 1194 [3]; CPL 240.40 [2] [b] [v]), it is not logical that a driver who otherwise can be compelled to have his or her blood drawn specifically for such purpose will forgo necessary medical treatment solely on the basis that the sample drawn for medical purposes will be used in a subsequent prosecution. It has been said that "the supposition that patients will conceal ailments or will fail to seek medical care unless protected by a statute against disclosure[ ] is fallacious. In states where the privilege does not exist, there is no indication of any hesitation by the public to avail itself of the services of physicians or hospitals" (Fisch, New York Evidence § 557, at 376 [2d ed], citing Lipscomb, *Privileged Communications Statute Sword and Shield*, 16 Miss LJ 181 [1944]; *see generally* Developments in the Law—Privileged Communications, 98 Harv L Rev 1530, 1543 [1985]). Significantly, the federal courts do not recognize the physician-patient privilege unless state law supplies the rule of decision (*see e.g. United States v University Hosp. of State Univ. of N.Y. at Stony Brook*, 575 F Supp 607, 611 [1983], *affd* 729 F2d 144 [1984]).

Moreover, in a time where the Legislature has made chemical testing compulsory (*see e.g.* Vehicle and Traffic Law § 1194 [3]), we cannot subscribe to an interpretation of the physician-patient privilege, similarly rooted in statute, that would expand its reach so as to contravene the public policy interests behind the compulsory-testing legislation and which would serve only to reward the intoxicated driver while impairing the laudable public policy objective of combating drunk driving. Specifically, the extension of the physician-patient privilege would only al-

low the driver to forestall the inevitable and prevent the testing of an earlier-obtained blood sample notwithstanding that the driver, as the defendant here, can be later compelled to provide a blood sample. Thus, the application of the privilege to the defendant's physical blood sample drawn by a medical provider affords him no real protection. At the same time, however, the State's efforts to obtain the most reliable evidence to prosecute the driver, particularly in light of the exigent circumstances that exist, would be thwarted (*see e.g. Matter of Stark v New York State Dept. of Motor Vehs.*, 65 NY2d 720, 721-722 [1985] [holding that warrantless arrest was justified by the exigent circumstance of enabling the police to attempt to ascertain the petitioner's blood alcohol level within the two-hour limit prescribed in Vehicle and Traffic Law § 1194]). Thus, from a practical standpoint, the oft-stated policy consideration of the physician-patient privilege that disclosure would deter people from seeking medical help and securing adequate diagnosis and treatment is not implicated since under existing law, the motorist can be compelled to give a blood sample under circumstances such as those that existed here.

The United States Supreme Court has expressly held that the compulsion to draw blood does not violate the privilege against self-incrimination pursuant to the Fifth Amendment, as secured against state invasion by the Fourteenth Amendment (*see Schmerber v California*, 384 US at 761; *cf. People v Havrish*, 8 NY3d 389, 393 [2007], *cert denied* 552 US —, 128 S Ct 207 [2007]; *People v Craft*, 28 NY2d 274, 276-277 [1971]). In *Schmerber,* the United States Supreme Court, in determining that the privilege did not apply, reasoned that the privilege "protects an accused only from being compelled to testify against himself [or herself], or otherwise provide the State with evidence of a testimonial or communicative nature, and that the withdrawal of blood . . . [does] not involve compulsion to these ends" (*Schmerber v California*, 384 US at 761; *see People v Kates*, 53 NY2d 591, 594 [1981]). Thus, the United States Supreme Court opined that "compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate" the privilege against self-incrimination (*Schmerber v California*, 384 US at 764).

The physician-patient privilege similarly seeks to protect evidence of a testimonial or communicative nature (*see e.g. Matter of Grand Jury Investigation in N.Y. County*, 98 NY2d at 532-533; *People v Petro*, 122 AD2d at 310). However, there is noth-

ing in the language of CPLR 4504 (a) indicating that it was meant to encompass, as the defendant suggests, real or physical evidence (*cf. Schmerber v California*, 384 US at 770; *People v Kemp*, 59 AD2d 414, 421 [1977]] [marital privilege is testimonial and thus, protects communications between spouses, but cannot be used to suppress contraband constituting real evidence belonging to one spouse that was disclosed by the other to the police]).

In conclusion, there is nothing in the language of CPLR 4504 (a) or in the case law interpreting it that supports its application to the physical blood samples at issue here. Moreover, there is simply no compelling public policy interest that would justify expanding the physician-patient privilege to a physical blood sample. To hold otherwise would deprive the jury of lawfully seized material and probative evidence. Thus, we conclude that the physician-patient privilege is not applicable to a physical blood sample drawn by a medical professional and lawfully seized pursuant to CPL 690.10. Accordingly, the Supreme Court properly denied that branch of the defendant's motion which was to suppress the search warrant blood samples.

In addition, the trial court properly refused to charge the jury with criminally negligent homicide as a lesser-included offense of manslaughter in the second degree. There was no reasonable view of the evidence which would support a finding that the defendant committed the lesser offense but not the greater (*see* CPL 300.50 [1]; *People v Glover*, 57 NY2d 61, 64 [1982]; *see also People v Donohue*, 123 AD2d 77, 81-82 [1987]; *People v Verdile*, 119 AD2d 891, 893-894 [1986]; *People v Morton*, 100 AD2d 637, 638-639 [1984]; *People v Van Dusen*, 89 AD2d 649 [1982]).

Accordingly, the judgment is affirmed.

SCHMIDT, J.P., SANTUCCI and LIFSON, JJ., concur.

Ordered that the judgment is affirmed.