J-A11038-17

2017 PA Super 245

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
ROEGESTER GRAYS :
:
Appellant : No. 1249 MDA 2016

Appeal from the Judgment of Sentence January 7, 2016
In the Court of Common Pleas of Bradford County
Criminal Division at No(s): CP-08-CR-0000787-2013

BEFORE: SHOGAN, MOULTON, JJ., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.: **FILED JULY 25, 2017**

Appellant, Roegester Grays, appeals from the judgment of sentence

entered in the Court of Common Pleas of Bradford County following his

conviction by a jury on two counts of homicide by vehicle while driving under

the influence of alcohol ("homicide by vehicle-DUI"), one count of

aggravated assault by vehicle while driving under the influence ("aggravated

assault by vehicle-DUI"), two counts of homicide by vehicle, one count of

aggravated assault by vehicle, two counts of driving under the influence-

general impairment and high rate ("DUI"), and one count of possession of a

controlled substance.[1] After a careful review, we affirm.

_____

[*] Former Justice specially assigned to the Superior Court.
[1] 75 Pa.C.S.A. §§ 3735(a), 3735.1(a), 3732(a), 3732.1, 3802(1), 3802(b),
and 35 P.S. § 780-113(a)(31), respectively. Appellant was also convicted by
*(Footnote Continued Next Page)*

The relevant facts and procedural history are as follows: On March 1, 2013, at approximately 5:00 p.m., Appellant, who was driving a Chevrolet Avalanche ("Avalanche") westbound on Route 328, collided head-on with a Chevrolet Suburban ("Suburban"), which was traveling eastbound on Route 328 and being driven by Ryan English. As a result of the crash, Mr. English and his wife, Karen English, were killed instantly, and their thirteen-year-old son, C.M.,[2] and four-year-old son, L.E., were injured. Their ten-year-old son, G.E., was not injured.

Appellant was arrested and charged with numerous crimes. On November 21, 2013, he filed a lengthy counseled, pre-trial motion seeking, *inter alia*, to suppress his blood alcohol content ("BAC") from blood that was drawn on March 1, 2013, at 9:20 p.m., after he was arrested by Pennsylvania State Police Trooper John J. Youngblood,[3] to suppress the

_(Footnote Continued)_ ──────────────

the trial court of the following summary violations: meeting vehicle proceeding in opposite direction, disregard traffic lane, careless driving, reckless driving, and limitation on driving left side of road (75 Pa.C.S.A. §§ 3302, 3309(a), 3714, 3736(a), and 3306, respectively).

[2] Mr. English was C.M.'s stepfather, and Mrs. English was his biological mother. N.T., 11/17/15, at 9.

[3] In his motion, Appellant averred this post-arrest BAC should be suppressed since (1) the BAC was the product of an illegal arrest by Trooper Youngblood since the arrest was made outside of the officer's jurisdiction; (2) Trooper Youngblood lacked probable cause to arrest Appellant; (3) there was no proper chain of custody with regard to the blood drawn at 9:20 p.m.; and (4) the blood was drawn more than two hours after the collision in violation of 75 Pa.C.S.A. § 3802.

physical evidence seized by the police from his vehicle, and to suppress pre-arrest statements Appellant made to Trooper Youngblood at the Arnot Ogden Medical Center ("Arnot Ogden") Emergency Room in New York.

Following a hearing held on January 7, 2014,[4] by order and opinion filed on April 1, 2014, the trial court granted Appellant's motion to suppress Appellant's post-arrest BAC from the blood drawn at 9:30 p.m. upon request of Trooper Youngblood; however, the trial court denied Appellant's motion to suppress the evidence obtained from the search of his vehicle and the evidence gained by the police at Arnot Ogden prior to Appellant's arrest. Trial Court Order, filed 4/1/14.

On July 25, 2014, Appellant filed an additional pre-trial omnibus motion in which he sought, *inter alia*, to suppress and/or preclude the Commonwealth from introducing Appellant's medical records from Arnot Ogden, particularly Appellant's pre-arrest BAC from blood drawn at 5:30 p.m. on March 1, 2013, by order of Appellant's treating physician, Joseph Haluska, M.D., at the Arnot Ogden Emergency Room. Specifically, Appellant contended the medical records were obtained via an improperly issued and served subpoena, in violation of Appellant's doctor-patient privilege, and

_____

[4] Appellant has not provided this Court with the notes of testimony from this hearing.

inadmissible as there was no "paper trail" establishing blood was actually drawn by order of Dr. Haluska. The trial court denied Appellant's motion.

On January 16, 2015, Appellant filed a motion *in limine* seeking to preclude the Commonwealth from admitting into evidence Appellant's pre-arrest BAC from the blood drawn and tested by order of Dr. Haluska. In this motion, Appellant asserted his pre-arrest BAC should be precluded as the Arnot Ogden laboratory was not a fully licensed and approved Pennsylvania facility for testing purposes. The matter proceeded to a hearing on May 26, 2015, and by order entered on July 13, 2015, the trial court denied Appellant's January 16, 2015, motion *in limine*.

On August 10, 2015, Appellant filed another motion *in limine* in which he again sought to preclude his pre-arrest BAC from the blood drawn and tested by order of Dr. Haluska. In this motion, Appellant contended that the introduction of his pre-arrest BAC would violate his due process rights as the Commonwealth failed to preserve a sample of Appellant's blood, thus precluding Appellant from independently testing his blood. The trial court denied Appellant's motion *in limine* with regard to his request to preclude the introduction of his pre-arrest BAC.

On November 16, 2015, the matter proceeded to a jury trial at which the parties stipulated that the death of Mr. and Mrs. English was caused by trauma incurred during the motor vehicle collision at issue. N.T., 11/16/15, at 32. With regard to the collision, Rita Dennison testified that she resides

- 4 -

in a rural area near Route 328, and on March 1, 2013, she was at home with her brother, who was visiting and making plans to assist her with mowing her lawn. *Id.* at 34. She indicated that, in an effort to show her brother her property lines, she and her brother were looking out of her kitchen window, which faced Route 328, when she saw an Avalanche "zooming" down the road, passing all of the cars that were going with the normal flow of traffic. *Id.* at 35. Mrs. Dennison continued to watch the Avalanche and, as it crested up the hill, she noted that the Avalanche was still passing vehicles, even though the road was lined for no passing in that area of the road. *Id.* She indicated the Avalanche was traveling west and passing cars on a double lined road. *Id.* at 36. Mrs. Dennison testified that, just after the Avalanche left her sight, she "heard an awful crash, it sounded like an explosion." *Id.* She did not investigate the source of the noise, but when her husband returned home shortly thereafter, she informed him of the noise, and he left on his four-wheeler to investigate. *Id.* at 37.

Mrs. Dennison's brother, Hugh B. Cunningham, confirmed he was visiting Mrs. Dennison on the day of the accident, and as they were looking out of her kitchen window, he noticed a large vehicle "hauling butt" and passing other vehicles in a no-passing zone. *Id.* at 58. He indicated that, as Mrs. Dennison moved to look out of the other kitchen window, she said "[he's] so fast he's going up the hill[,]" and then he heard "an explosion." *Id.*

Mrs. Dennison's husband, Joe Dennison, confirmed that he drove his four-wheeler to the top of the hill near his house on Route 328 and several firefighters had already arrived on the scene. *Id.* at 63. He observed an Avalanche on the left side of the road and another vehicle, which was upside down, covered with a tarp. *Id.*

Anthony Amentler testified that, on the day in question, he was driving a pick-up truck loaded with hay on Route 328 East and, as he turned a corner, a Suburban was traveling in the same direction ahead of him. *Id.* at 70. He testified that the two vehicles were traveling at a "normal speed." *Id.* He indicated that, as they started up a hill, the Suburban was about five car lengths in front of him when he suddenly noticed a large vehicle, later identified as an Avalanche, coming towards them "on the wrong side of the road." *Id.* at 71. Mr. Amentler clarified that all four tires of the Avalanche were over the double yellow line "on the wrong side" of the road. *Id.* at 80. He testified the Suburban stayed in its lane of travel and was hit "pretty much head-on" by the opposing Avalanche. *Id.* at 72. The Suburban "flipped up in the air and ended up on the other side of the road[,]" and the Avalanche "spun back into the guardrails." *Id.* Mr. Amentler indicated he was able to avoid the collision, traveled to the top of the hill, pulled his truck to the side of the hill, stopped an oncoming westbound vehicle, and asked the driver to call 911. *Id.* at 73.

Mr. Amentler testified he then ran down the hill to the crash site and heard the sound of children crying from inside the Suburban, which was upside down. *Id.* at 74. He looked inside the back passenger area and saw a child hanging upside down in a car seat. *Id.* With the assistance of other motorists, he removed the children from the Suburban, but he was unable to assist the driver (Mr. English) or the front seat passenger (Mrs. English) as he "couldn't get into that compartment" of the vehicle. *Id.*

Mr. Amentler then ran to check on the driver of the Avalanche, later identified as Appellant, and found him still seated in the driver's seat. *Id.* at 75. Appellant had blood coming out of the bridge of his nose and was complaining of pain to his nose. *Id.* Mr. Amentler was unable to open the Avalanche's front door, so he opened the back door and a beer can fell out of the vehicle. *Id.* At this point, since Appellant did not seem to be hurt too badly, Mr. Amentler decided it was best to let the authorities take over with regard to the Avalanche and Appellant. *Id.*

Mr. Amentler testified he went back to assisting the children, one of whom was obviously severely injured. *Id.* at 76. Ambulances and firefighters responded to the scene, and Mr. Amentler remained to speak to the Pennsylvania State Police, who arrived within half an hour of the crash. *Id.* He noted that, from the time the accident occurred until the police arrived, neither vehicle involved in the accident moved. *Id.* at 77.

C.M. confirmed that he was in the Suburban on the day in question with his siblings, as well as his puppy, PJ, who perished in the accident, and the family's adult black Labrador Retriever, Lila. N.T., 11/17/15, at 11. C.M. testified that Mr. English was driving, Mrs. English was in the front passenger seat, he was on the left side of the back passenger seat, L.E. was in a car seat on the right side of the back passenger seat, and G.E., as well as Lila, were in the third row. *Id.* at 8, 12. C.M. indicated that he remembered seeing a truck coming towards the family's Suburban and it was "driving on [their] side of the lane." *Id.* After the collision, the Suburban was "upside down" and all three boys, who were wearing seat belts or secured in a car seat, were dangling upside down. *Id.* at 13. C.M. did not see or hear any noise coming from his stepfather or mother. *Id.* at 14. C.M. testified that he crawled out of the Suburban, and by the time he exited, a man was holding L.E.; G.E. was also out of the Suburban and so was the dog, Lila. *Id.* at 15-16.

C.M. testified that he had pain in his stomach area and an ambulance took him to a hospital. *Id.* at 17. He underwent surgery on his abdomen and he suffered a broken arm, which required a cast and physical therapy. *Id.* at 18. C.M. was in the hospital, and he was reunited with the family dog, Lila, after he was released. *Id.* at 19. He indicated that L.E. suffered a broken leg, which required a cast. *Id.* at 20.

Michael Kipferl, a postal employee, testified that he was traveling behind Mr. Amentler's pick-up truck, which was directly behind the English's Suburban, when he saw a vehicle "coming around the corner in [their] lane...and [strike] the Suburban head-on." *Id.* at 44. He indicated that the Suburban tried to go to the left in an attempt to get in the other lane, but it was hit head-on, resulting in it "barrel rolling" onto its roof and landing in the ditch. *Id.* at 45. Mr. Kipferl immediately stopped his vehicle, ran to the driver of the Avalanche, determined the driver was conscious, and then ran to the Suburban to check on its occupants. *Id.* He saw three children dangling from their safety restraints and assisted at least one of them out of the Suburban. *Id.* at 46. There was no movement from Mr. English or Mrs. English. *Id.*

Michael Frawley testified that he did not observe the accident, but came upon it as a gentleman was removing children from the Suburban. *Id.* at 53-54. Since it was cold outside, he placed two of the children in his vehicle to await the arrival of emergency personnel. *Id.* at 54. He noted that he saw Appellant in the Avalanche, as well as beer cans lying on the driver's side floor and outside on the ground. *Id.* at 56, 60-61, 63. He denied seeing a large or medium-sized animal running around the accident scene, although he later learned that the English family had a black Labrador Retriever, which was in the Suburban at the time of the accident. *Id.* at 69-71.

Jeremy Sheive testified that he is a volunteer firefighter, and he responded to the accident scene. *Id.* at 80-81. He went directly to the Suburban, and he was informed that three children had escaped but that two adults were still inside. *Id.* at 82. He began to extricate the front seat adults and discovered that they were already deceased. *Id.* at 84-85.

Jeffrey L. Sweet, Jr., testified that he is an ambulance driver, and he transported Appellant to the nearest hospital, Arnot Ogden. *Id.* at 91. He indicated it took approximately twenty-five to thirty minutes to reach Arnot Ogden, and upon arrival, Appellant was taken directly to the Emergency Room. *Id.* at 94-95.

The paramedic working with Mr. Sweet, Ashley Adams Prosser, testified that her records reveal they began transporting Appellant from the scene at 5:14 p.m. and arrived at Arnot Ogden at 5:28 p.m. *Id.* at 102. Ms. Prosser testified she did not draw blood from Appellant, but she unsuccessfully attempted to insert an IV to administer pain medicine for his obviously fractured ankle. *Id.* at 102-06. She indicated that Appellant signed a consent form permitting him to be transported by the ambulance to the hospital. *Id.* at 107. She noted that, during the transport, Appellant told her a few times that he had swerved to miss hitting a black dog and, upon hindsight, he wished he had hit the dog instead of attempting to miss it. *Id.* at 109.

Pennsylvania State Police Trooper David Kittle testified that he received a radio dispatch for a crash on Route 328, and he arrived at the scene at approximately 5:29 p.m. *Id.* at 27. He indicated it was still daylight at this time, and emergency personnel were on the scene; however, the children, as well as Appellant, had already been removed from the scene via ambulance. *Id.* at 30. Mr. and Mrs. English were deceased in the Suburban. *Id.* at 36.

Trooper Kittle described Appellant's Avalanche as facing eastbound on the shoulder of the road against the guardrail, and the English's Suburban was flipped over on the north shoulder of the road. *Id.* at 32-33. Trooper Kittle indicated that he saw an empty beer can lying on the road on the driver's side of the Avalanche; however, he did not remember Mr. Amentler informing him that the beer can had fallen out of the Avalanche when he opened the back door. *Id.* at 40-41. He indicated that a subsequent search of Appellant's vehicle pursuant to a search warrant revealed a sandwich baggie containing soft-rolled marijuana cigarettes. *Id.* at 160.

Pennsylvania State Trooper Timothy P. Young testified that his primary role is that of a state fire marshal, but he also analyzes vehicles involved in crashes. *Id.* at 129. He analyzed the two vehicles involved in the present crash and "observed that [they] had severe front-end damage to them." *Id.* at 131. He noted that he saw no evidence leading him to believe that either

the Avalanche or Suburban were not in good working order prior to the crash. *Id.* at 131-32.

Kyle Wisel, a detective for the District Attorney's Office, testified that in May of 2013 he interviewed Appellant at his house. *Id.* at 137-38. Appellant, who was in a wheelchair due to an ankle injury, told Detective Wisel that, on the day of the crash, he had taken a prescribed muscle relaxer and had "consumed a couple of beers." *Id.* at 141. Appellant told Detective Wisel that, before the crash, "a medium-sized black dog had entered the roadway." *Id.* at 143. Detective Wisel noted that photos taken from the scene reveal two beer cans lying near Appellant's vehicle. N.T., 11/19/15, at 65, 68.

At this point, the District Attorney read into evidence a portion of Appellant's testimony from a motion *in limine* hearing at which Appellant indicated "what lead into the accident, either a small dog or a deer *per se* was in the road and [he] went to avoid this animal and successfully avoided this animal and then an on-coming car was in [his] path and [he] tried to avoid colliding with them." N.T., 11/17/15, at 158.

Matthew Brann, M.D., confirmed that, as a result of the accident, C.M. suffered a growth plate injury to his wrist, which required casting. N.T., 11/18/16, at 4. Further, he testified C.M. suffered "a bowel perforation, Jejunum Perforation which is the small bowel[,] [a]n ulcer, a hematoma on Duodenum[,] which is also the small bowel[,] and injuries to his Transverse

Colon." *Id.* at 5. Dr. Brann testified surgery was necessary to address C.M.'s internal injuries. *Id.* He noted that, with regard to the bowel injury, there was a significant risk of infection and septic shock, which can lead to death. *Id.* at 6. Dr. Brann testified that C.M. was transported via helicopter to a hospital in Rochester, New York, where his surgery was performed. *Id.* at 15. C.M. was in the hospital for twelve days. *Id.* at 6. Dr. Brann indicated that C.M.'s wrist healed well, although he continued to have "some discomfort with repetitive activities such as doing hay or tennis." *Id.* at 20.

He testified that L.E. suffered a fracture to his left tibia, which required casting. *Id.* at 7. Dr. Brann admitted that, initially, L.E. was evaluated on March 1, 2013, at Arnot Ogden, and the fracture was not discovered at this time. *Id.* at 9-10. However, on March 2, 2013, when L.E. returned for a follow-up appointment, medical personnel noticed that L.E. was not putting weight on his leg, and the fracture was discovered. *Id.* at 10. Dr. Brann testified that, on March 21, 2013, L.E.'s leg was placed in a short cast, which was removed on April 11, 2013. *Id.* at 12-13. Dr. Brann noted that L.E.'s fracture healed well. *Id.* at 13.

Joseph Haluska, M.D., a physician at Arnot Ogden, testified that he treated Appellant in the Emergency Room. *Id.* at 34-35. He indicated that he ordered a blood alcohol test because he intended to administer "very potent pain medication" to Appellant and he needed to ensure that he did not "create a more dangerous situation by giving [Appellant] a potent

- 13 -

narcotic for pain relief on top of [a] possible significant alcohol level." *Id.* at 36. He specifically testified that he ordered the blood alcohol test "solely for the...diagnosis and treatment of [Appellant's] injuries." *Id.* at 37. He indicated that he did not perform the actual blood draw, but that he ordered such a draw and testing be performed. *Id.* at 37-38. After he received the results of the test, Dr. Haluska ordered that Appellant receive a narcotic drug, Dilantin, which was administered at 6:10 p.m. *Id.* at 41, 43-44. He noted that Dilantin would not affect one's blood alcohol content. *Id.* at 46.

Katie Dieterle, a physician's assistant in the Emergency Room of Arnot Ogden, testified that she assisted with the care of Appellant on March 1, 2013, and she smelled a strong odor of alcohol on his breath. *Id.* at 52.

Kelly Caporaso, R.N., testified she was an intravenous specialist at Arnot Ogden, and after being directed to do so by Dr. Haluska, she performed a blood draw on Appellant on March 1, 2013, at approximately 5:30 p.m. *Id.* at 73-74, 88. After drawing the blood, she placed it in a tube; she placed the tube in a biohazard bag and carried it to the laboratory. *Id.* at 75. She noted this is her normal practice with regard to the treatment of patients, and it was not done for legal purposes. *Id.* at 77.

Elizabeth Catherine Martin, the System Director of Phlebotomy Services at Arnot Ogden, testified that the laboratory was certified by the New York State Department of Health to conduct blood alcohol testing. *Id.* at 56. She testified that, on March 1, 2013, the Arnot Ogden laboratory was

not specifically certified by Pennsylvania to conduct blood alcohol testing because, at that time, Pennsylvania accepted its sister state's certification. *Id.* at 70. She noted that the testing is done using a machine, which prints out a blood serum report. *Id.* at 59. The machine that Arnot Ogden uses is the Cobas 6000 made by Beckman-Colder. *Id.* at 69. She indicated that there is a conversion factor recognized to convert serum levels to whole blood levels, which is recognized by the Journal of Toxicology. *Id.* at 67. She explained that "if you were to take [the] serum alcohol level and divide it by 1.18 you would get the equivalent whole blood alcohol level." *Id.* at 61.

Cindy H. Schrader, a medical technologist at Arnot Ogden, testified that for blood alcohol testing the laboratory takes a specimen, spins in it the centrifuge, and then an alcohol level based on the serum is determined. *Id.* at 120. She indicated that she performed the testing of Appellant's pre-arrest blood draw, and at 6:14 p.m., his serum blood alcohol level was 0.145%. *Id.* at 124, 126.

Ms. Martin was recalled to the stand and she testified that the conversion from serum blood alcohol to a corresponding blood alcohol would be .123% in the case *sub judice*. *Id.* at 159. Ms. Martin testified that Arnot Ogden provided Appellant's medical records, which contained his serum blood alcohol level, to the Commonwealth of Pennsylvania in response to a search warrant. *Id.* at 160.

Pennsylvania State Police Trooper John J. Youngblood testified that he arrived at the accident scene at 5:45 p.m., and Appellant had already been transported to the hospital. *Id.* at 105. Trooper Youngblood went to Arnot Ogden at 7:45 p.m. in order to speak to Appellant, and at this time, Dr. Haluska informed him that a medical draw of Appellant's blood had been done. *Id.* at 106, 164. Upon questioning, Appellant told the trooper that the accident occurred when either he or the Suburban swerved to miss a black Labrador Retriever. *Id.* at 106. In speaking with Appellant, Trooper Youngblood noticed "a faint odor of alcohol" and that Appellant's speech was "slow." *Id.* at 108, 117. Accordingly, he asked Appellant if he had been drinking, using drugs, or taking any medication. *Id.* at 108. Appellant denied drinking alcohol or using drugs, but he admitted he had taken a blood thinner, as well as a muscle relaxer, earlier in the day. *Id.* Appellant told the trooper he had been traveling at approximately 55 mph at the time of the collision. *Id.* at 116.

Pennsylvania State Police Trooper Joseph F. Wasko, who is a collision analyst and reconstruction specialist, testified that he was called at 6:00 p.m. to report to the scene, and he arrived approximately fifty minutes later. N.T., 11/19/15, at 5. He examined the scene and came back on March 25, 2013, to map the scene. *Id.* at 6. Trooper Wasko testified the roadway, from fog line to fog line, measured 22.02 feet wide, with the westbound lane being 10.86 feet wide and the eastbound lane being 11.18 feet wide. *Id.* at

16-19, 37-38. He indicated the Suburban was 6.58 feet wide with a curb weight of 5,743 pounds, and the Avalanche was 6.67 feet wide with a curb weight of 5,652 pounds. *Id.* at 19, 48-49. The Avalanche was 18.5 feet long. *Id.* at 47. The berm on the eastbound lane, from the fog line to the guardrails, measured 3.03 feet. *Id.* at 38.

Trooper Wasko testified that he also analyzed both vehicles' airbag control modules, which electronically recorded the vehicles' data, and determined that the Suburban was traveling at 60 mph at two seconds before impact, 44 mph at one second before impact, and 40 mph at half a second before impact. *Id.* at 21-22. The Avalanche was traveling at 61 mph at two seconds before impact and 56 mph at one second before impact. *Id.* at 23. There was no data as to half a second before impact for the Avalanche. *Id.*

The trooper noted that he examined the vehicles and discovered that the Avalanche had more frontal impact as compared to the Suburban, which had more of an angled impact on the front passenger side. *Id.* at 24. Trooper Wasko opined that the Suburban was attempting to avoid the collision. *Id.* at 54-55. He also opined that, based on his analysis of the accident scene and the damage to the vehicles, both vehicles were in the eastbound lane when they collided. *Id.* at 27. He noted that the gouge marks, scrapes, and scratches in the road, which occurred during the

collision, revealed that the vehicles collided in the eastbound lane. *Id.* at 28.

Trooper Wasko opined that, when the vehicles collided, the Suburban slid sideways from the eastbound lane across the center lane to the westbound lane, and when it reached the muddy, soft shoulder, it tipped onto its roof. *Id.* at 31. He testified that, upon collision, the Avalanche spun in a clockwise manner, remained "right side up," and landed parallel to the eastbound guardrails in a westward direction. *Id.* at 31-32, 40. Trooper Wasko explained that the Avalanche came to a rest in the westward direction because of the mass and weight of the vehicles, combined with the speed of impact, and the energy from the collision. *Id.* at 49-50. He clarified that, during the collision, the vehicles touched each other for "a split second" and "as they are impacting one or both [vehicles] are going to the ground creating the gouges and [other] evidence[.]" *Id.* at 54. He noted the vehicles then rebounded and, based on the transfer of energy, as well as the direction the vehicles were traveling at the point of impact, physics determined where the vehicle would end up. *Id.* at 54-55. He noted the fact the Suburban "was already in a turning maneuver to try to avoid the collision" determined the vehicle would continue in that direction after impact, and the angle at which the Avalanche was hit meant that it could "only go one way and it can only go clockwise and come backwards and

spin, it [couldn't] go any other way because the [Suburban] [was] preventing it from going that way." *Id.* at 55.

The defense presented the testimony of Diana Protzman, a rescue worker for a nearby fire department. She testified that she responded to the scene and approached Appellant, who was sitting in the driver's seat of the Avalanche. *Id.* at 83. She noticed that he had a laceration to his lip and chin, as well as injuries to his ankle. *Id.* at 84. She placed gauze on his lip and instructed him to hold it in place. *Id.* at 85. She indicated that she was at about an arm's length away from Appellant for four to five minutes. *Id.* During this time, she did not detect an odor of alcohol coming from Appellant and she did not observe any signs of intoxication. *Id.* at 86.

Appellant took the stand in his own defense, and he testified that he retired from the United States Navy due to a medical disability involving his heart and lower legs. *Id.* at 89. He denied consuming alcohol on March 1, 2013, and he denied driving his vehicle in the fashion described by Ms. Dennison and her brother. *Id.* at 91-98. He testified that, as he was approaching the area where the collision occurred, he was going the speed limit and there were no cars in front of or behind him. *Id.* at 99.

Appellant indicated that, as he crested the hill "a black animal had hopped out in front of [him] and [he] swerved to miss it." *Id.* He clarified that the animal came from his right. *Id.* He indicated that his reaction was to jerk the steering wheel and then look in his rear view mirror to determine

whether he had hit the animal. *Id.* at 99-100. He determined that he did not hit the animal and when he looked forward again he saw "a vehicle coming straight at [him]." *Id.* at 100. He indicated that his vehicle was situated on his side of the road in the westbound lane and the opposing vehicle was at an angle coming into his lane. *Id.* He tried to avoid the collision, but he was unable to do so. *Id.* at 101. He noted his Avalanche's front passenger side hit the front passenger side of the Suburban. *Id.*

Appellant testified that, as he was being removed from the vehicle by emergency personnel, he advised them that he had swerved to avoid a black animal, which may have been a dog. *Id.* at 105-06. He noted that he also told the woman in the ambulance, hospital personnel, Trooper Youngblood, and the detective from the District Attorney's Office that he had swerved to miss a black dog or black animal. *Id.* at 108-09. He testified that the only person with whom he had any verbal interaction at the accident scene was Ms. Protzman. *Id.* at 110.

Appellant indicated that, during the ambulance ride to Arnot Ogden, Ms. Prosser told him that he was being transported to a hospital in New York, but since the accident occurred in Pennsylvania, he needed to sign a consent form so that blood could be drawn. *Id.* at 111. Contrary to Ms. Prosser's testimony, Appellant testified that Ms. Prosser withdrew one vial of blood from him while he was in the ambulance. *Id.* Appellant further testified that, after he was taken into the Emergency Room, Ms. Prosser

went out to the ambulance to retrieve the vial of blood, but he has no knowledge of what happened to the blood after this time. *Id.* at 112-13.

Contrary to Nurse Caporaso's testimony, Appellant denied that Nurse Caporaso drew any pre-arrest blood samples from him while he was at Arnot Ogden. *Id.* at 114. He admitted that she gave him an injection of a narcotic for the pain. *Id.* at 115.

Appellant testified that, at approximately 8:00 p.m., Trooper Youngblood arrived at Arnot Ogden, he asked Appellant to consent to a blood draw, and Appellant consented, resulting in one vial of post-arrest blood being drawn from his person by a nurse. *Id.* at 115-17. Appellant further testified that Trooper Youngblood immediately took control of the vial of blood.[5] *Id.* at 117. He indicated that he informed Trooper Youngblood that he had not consumed any alcohol on that day. *Id.* at 118. He noted that, in May of 2013, he subsequently informed the detective from the District Attorney's Office that he had not consumed any alcohol on March 1, 2013; however, he admitted that he told the detective that he had taken a muscle relaxer and consumed "some beers" the night before the accident. *Id.* at 118-19. He denied that any beer cans fell out of his Avalanche on the day of the accident. *Id.* at 124.

_____

[5] As we indicated *supra*, the the results of this blood draw were suppressed by the trial court.

At the conclusion of all testimony, the jury convicted of Appellant of the offenses indicated *supra*, and the trial court convicted Appellant of the summary offenses indicated *supra*. Appellant filed a post-verdict motion alleging the verdicts were not supported by sufficient evidence and/or the verdicts were against the weight of the evidence. By order entered on January 6, 2016, the trial court denied Appellant's post-verdict motions, and on January 7, 2016, Appellant proceeded to a sentencing hearing, at the conclusion of which he was sentenced to an aggregate of 252 months plus 30 days in prison to 564 months in prison.[6] Appellant was given 488 days of credit for time served, and he filed timely post-sentence motions,[7] which were denied by operation of law on June 20, 2016. This timely counseled appeal followed. The trial court directed Appellant to file a Pa.R.A.P. 1925(b) statement, Appellant timely complied, and the learned trial judge,

_____

[6] Specifically, the trial court sentenced Appellant to the following: homicide by vehicle-DUI, 60 months to 120 months in prison; homicide by vehicle-DUI, 60 months to 120 months in prison; aggravated assault by vehicle-DUI, 48 months to 96 months in prison; homicide by vehicle-30 months to 84 months in prison; homicide by vehicle-30 months to 84 months in prison, aggravated assault by vehicle-24 months to 60 months in prison, and possession of a controlled substance-30 days in prison. The trial court directed that all sentences be served consecutively to each other for an aggregate of 252 months plus 30 days to 564 months in prison. The trial court imposed fines with respect to each summary conviction.

[7] In his post-sentence motion, Appellant alleged, *inter alia*, that the trial court should have suppressed or precluded the use of his medical records from Arnot Ogden as such violated his doctor-patient privilege and the trial court abused its discretion in imposing Appellant's sentence.

the Honorable Maureen T. Beirne, filed a responsive Pa.R.A.P. 1925(a) opinion on November 2, 2016.

Appellant presents the following issues for our review:

1. Whether the trial court erred in denying via operation of law the motion for judgment of acquittal with respect to counts 6, 7, 8, 9, 10, 11, 14, 15, 16, 18, 20, and 21 where the undisputed physical facts establish it was not possible for [Appellant's] vehicle to have been in the eastbound travel lane of the highway at the time of the collision and therefore the returned verdicts were not supported by sufficient evidence?

2. Whether the trial court erred in finding that sufficient medical evidence had been presented to establish the minor child had suffered a serious bodily injury and therefore there was insufficient evidence to support the convictions on counts 3 and 4?

3. Whether the trial court erred in denying the motion to suppress the introduction of the hospital medical records and contents of same related to a non-consensual medical treatment blood draw when [Appellant] had not waived his doctor/patient privilege with respect to those records?

4. Whether the trial court erred in imposing maximum aggravated range minimum sentences, consecutive to each other, for both homicide by vehicle-DUI and homicide by vehicle-non-DUI where there was one collision which caused two deaths?

5. Whether the trial court erred in imposing maximum aggravated range minimum consecutive sentences for the convictions of aggravated assault by motor vehicle-DUI and aggravated assault by motor vehicle-non-DUI where there was only one victim?

6. Whether the trial court erred in considering [Appellant's] perceived lack of remorse and prior criminal history as the rationale supporting the imposed sentences?

Appellant's Brief at 5.[8]

With respect to Appellant's first and second issues, Appellant presents challenges to the sufficiency of the evidence sustaining certain convictions. Specifically, he avers (1) all of his convictions, except for possession of a controlled substance, are "dependent on the motor vehicle being operated by [Appellant] in a westerly direction being physically situate in the eastbound travel lane of the highway, in whole or in part[,]" *see* Appellant's Brief at 10, but the undisputed physical evidence does not support this determination; and (2) with respect to aggravated assault by vehicle and aggravated assault by vehicle-DUI, the alleged victim was C.M.; however, the evidence was insufficient to prove that C.M. suffered a "serious bodily injury" as is required for these convictions.

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and

---

[8] We have renumbered Appellant's issues for the ease of discussion.

all evidence actually received must be considered. Finally, the [finder] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

Further, in viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, the court must give the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

*Commonwealth v. Harden*, 103 A.3d 107, 111 (Pa.Super. 2014) (citation and quotation omitted).

In his first sufficiency challenge, Appellant specifically contends:

[I]t was not physically possible for the vehicle of [Appellant] to have been in the eastbound lane, in whole or in part, at the time of the collision and to spin in a clockwise manner post-collision and come to rest facing eastbound in the eastbound lane parallel with the guardrails without hitting the road signs or guardrails. For [Appellant's] vehicle to come to rest where it did[,] it had to pivot at least 180 degrees from its pivot point to its place of rest. It is factually undisputed the length of the vehicle was 18.50 feet. It is also undisputed that the distance from the center of the highway to the guardrails was a total of 14.21 feet. It is not physically possible for an item 18.50 feet in length to swing through a space of 14.21 feet without tearing down the street signs, without damaging or uprooting the guardrails, and without suffering significant damage to the passenger's side of the vehicle behind the double doors or to the rear. As the various photographs introduced into evidence show, the street signs remained upright and intact, the guardrails showed no damage, and there was no physical damage to the passenger's side of the motor vehicle or to the rear.

\*\*\*

The evidence establishing the physical impossibility of the vehicle being in the eastbound travel lane at the time of the collision comes from the undisputed true facts concerning the width of the eastbound lane, the width of the berm, the presence of the street signs along the eastbound lane, the presence of the guardrails along the berm of the eastbound lane, the final resting place of the vehicle, the clockwise spin of the vehicle, and the

total lack of damage to the vehicle which would exist if contact was made with the obstacles abutting the eastbound lane.

Appellant's Brief at 12.

As the trial court explained in its Rule 1925(a) opinion, Appellant's argument that the evidence revealed it was "physically impossible" for his vehicle to have been in the eastbound lane during the collision is contrary to the testimony of three eyewitness to the crash (Mr. Amentler, Mr. Kipferl, and C.M.), who all testified that they observed Appellant's Avalanche driving in the eastbound lane when it collided with the Suburban. Further, Appellant's argument is contrary to the testimony of the Commonwealth's accident reconstruction expert, Trooper Wasko, who, after explaining his findings and analysis, opined that both vehicles were in the eastbound lane when they collided. Accordingly, viewing the evidence in the light most favorable to the Commonwealth, as verdict winner, we conclude the evidence sufficiently established that Appellant was driving his Avalanche in the eastbound lane at the time of the collision. *See Harden*, *supra*.

We note that Appellant's suggestion of "physical impossibility" is based on his theory that, if his vehicle was in the eastbound lane upon impact, there would have been damage to street signs, the eastbound guardrail, and the passenger side/rear of his vehicle, none of which existed in this case. However, inasmuch as the jury (and the trial court with regard to the summary offenses) was free to weigh the evidence and make the necessary

credibility determinations, including considering the absence of damage, we reject Appellant's claim. ***See id.***

Appellant's next specific sufficiency claim is that, with respect to his convictions for aggravated assault by vehicle and aggravated assault by vehicle-DUI, the evidence was insufficient to prove that the victim (thirteen-year-old C.M.) suffered a "serious bodily injury" as is required for these convictions.

The Motor Vehicle Code relevantly provides as follows:

**§ 3732.1. Aggravated assault by vehicle**

**(a) Offense**.—Any person who recklessly or with gross negligence causes serious bodily injury to another person while engaged in the violation of any law of this Commonwealth of Pennsylvania or municipal ordinance applying to the operation or use of a vehicle or to the regulation of traffic, except section 3802 (relating to driving under influence of alcohol or controlled substance), is guilty of aggravated assault by vehicle, a felony of the third degree when the violation is the cause of the injury.

75 Pa.C.S.A. § 3732.1(a) (bold in original).[9]

**§ 3735.1. Aggravated assault by vehicle while driving under the influence**

(a) Offense defined.—Any person who negligently causes serious bodily injury to another person as the result of a violation of section 3802 (relating to driving under the influence of alcohol or controlled substance) and who is convicted of violating section

---

[9] Section 3732.1 was amended on November 4, 2016, effective in 60 days; however, since the amendments post-date Appellant's offense, they are not applicable to this matter. The same is true for 75 Pa.C.S.A. § 3732, which we discuss *infra*.

3802 commits a felony of the second degree when the violation is the cause of the injury.

75 Pa.C.S.A. § 3735.1(a) (bold in original).

With respect to the sole element challenged by Appellant, that of "serious bodily injury," the Motor Vehicle Code defines such as "[a]ny bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." 75 Pa.C.S.A. § 102. Serious bodily injury encompasses varying degrees of injury. *See Commonwealth v. Spotti*, 94 A.3d 367, 381 (Pa.Super. 2014) (*en banc* ) (finding evidence sufficient to support determination that victim suffered "serious bodily injury" when victim suffered bone infection in arm injured in car crash, spent almost a week in the hospital following surgery to combat infection, and continues to have limited use of arm); *Commonwealth v. Caterino*, 678 A.2d 389 (Pa.Super. 1996) (holding serious bodily injury existed where the victim underwent surgery to repair severed artery).

In the case *sub judice*, we conclude the evidence was sufficient to sustain the jury's finding that C.M. suffered "serious bodily injury." As the trial court aptly reasoned:

Dr. Matthew Brann, an orthopedic surgeon who treated the child victim, C.M., testified. [He indicated] C.M. suffered a growth plate injury to his right wrist that was displaced and had to be reduced in the emergency room the night of the collision. C.M. was in a cast until April 11, 2013. He also had a bowel perforation, Jejunum Perforation, which is the small bowel, an ulcer, a hematoma on Duodenum[,] which is also the small

bowel[,] and injuries to his transfer colon which were surgically treated. Dr. Brann testified that such injuries created a significant risk of infection and ultimately septic shock which in turn could cause death. C.M. was in the hospital for twelve days as a result of the injuries and surgery.

Trial Court Opinion, filed 10/27/16, at 10 (citations to record omitted).

The trial court's findings are supported by the record, and we agree with the trial court that such injuries constitute "serious bodily injury." *See* 75 Pa.C.S.A. § 102. Accordingly, we reject Appellant's sufficiency claim.

Appellant's next claim is that the trial court erred in refusing to suppress or preclude the Commonwealth from using his medical records from the Arnot Ogden Emergency Room, particularly the records concerning the pre-arrest draw of Appellant's blood at 5:30 p.m. and the resulting BAC. Appellant presents two specific arguments with regard to this claim: (1) Despite the fact the blood at issue was drawn and tested by order of Dr. Haluska for medical purposes only, the Commonwealth was required to prove that Appellant voluntarily consented to the drawing and testing of his blood, and (2) the Commonwealth's use of Appellant's medical records violated Appellant's doctor-patient privilege.

With regard to Appellant's first specific argument, Appellant avers that, since there is no evidence that he voluntarily consented to the warrantless blood draw, his medical records pertaining thereto ought to have been suppressed. Appellant cites to the United States Supreme Court's recent

decision in **Birchfield v. North Dakota**, ___ U.S. ___, 136 S.Ct. 2160 (2016), in support of his lack of consent claim.

**Birchfield** was decided on June 23, 2016, after Appellant's trial and sentencing but while his current, direct appeal was pending. Pertinent to the issue before us, in **Birchfield**, the U.S. Supreme Court analyzed the constitutionality of blood and breath tests under the Fourth Amendment guarantee against unreasonable searches and seizures. The High Court found that the Fourth Amendment permits a warrantless breath test incident to an arrest for drunk driving. **Id.** A blood test, however, because of its intrusive nature, requires a warrant to comport with Fourth Amendment requirements. **Id.**

Additionally, the U.S. Supreme Court held that blood tests taken pursuant to certain implied consent laws are an unconstitutional invasion of privacy. **Id.** The High Court held that motorists cannot be deemed to have consented to submit to a blood test "on pain of committing a criminal offense." **Id.** at 2186. Thus, in applying this ruling to one of the three consolidated cases before it—where the driver had consented to a blood draw after being informed that his refusal to do so could be criminally penalized—the U.S. Supreme Court in **Birchfield** remanded for the trial court to "reevaluate [that individual's] consent given the partial inaccuracy of the officer's advisory." **Id.** at 2186.

Subsequent to **Birchfield**, this Court decided **Commonwealth v. Evans**, 153 A.3d 323 (Pa.Super. 2016), wherein Evans was arrested and charged with two counts of DUI. In January of 2014 (prior to **Birchfield**), Evans filed a motion to suppress his BAC results on the basis his consent to the blood draw was involuntary and coerced by the police as he agreed to the blood draw only after the police provided him with the implied consent warnings required by 75 Pa.C.S.A. § 1547, during which he was informed that if he did not submit to the test he would face harsher penalties. Following a suppression hearing, the lower court denied Evan's motion to suppress, Evan was convicted and sentenced on the DUI offenses, and he filed an appeal to this Court.

Similar to Appellant in the case *sub judice*, **Birchfield** was issued during the pendency of Evan's direct appeal. In **Evans**, after concluding Evans had consented to the blood draw only "after being informed, by the police, that refusal to submit to the test could result in enhanced criminal penalties[,]" **id.** at 331, this Court applied **Birchfield** and relevantly held:

> Since **Birchfield** held that a state may not "impose criminal penalties on the refusal to submit to [a warrantless blood] test," the police officer's advisory to [Evans] was partially inaccurate. Therefore, we must vacate [Evan's] judgment of sentence, vacate the suppression court's order, and remand the case to the trial court to "reevaluate [Evans'] consent...[, based on] the totality of the circumstances...[and] given the partial inaccuracy of the officer's advisory."

**Evans**, 153 A.3d at 331 (quotation omitted).

Unlike in *Evans*, in the case *sub judice*, we need not determine whether *Birchfield* and its progeny are applicable to Appellant's claim that the Commonwealth was required to prove that Appellant consented to his blood being drawn and tested, despite the fact such was done upon order of Dr. Haluska for medical purposes.

As noted, the High Court decided *Birchfield* after Appellant's trial and sentencing in this case but during the pendency of this appeal. The decision announced a new criminal rule of law. Where a United States Supreme Court decision "results in a 'new rule,' that rules applies to all criminal cases still pending on direct review." *Schriro v. Summerlin*, 542 U.S. 348, 351, 124 S.Ct. 2519, 2522 (2004) (citation omitted). However, "[c]ase law is clear...that in order for a new rule of law to apply retroactively to a case pending on direct appeal, the issue had to be preserved at 'all stages of adjudication up to and including the direct appeal.'" *Commonwealth v. Tilley*, 566 Pa. 312, 318, 780 A.2d 649, 652 (2001) (quoting *Commonwealth v. Cabeza*, 503 Pa. 228, 469 A.2d 146, 148 (1983)).[10]

As indicated *supra*, in *Evans*, the voluntariness of the blood draw was presented to the lower court in a pre-trial suppression motion. Here,

---

[10] There is an exception to the issue-preservation requirement where the challenge is one implicating the legality of an appellant's sentence. *See Commonwealth v. Barnes*, ___ Pa. ___, 151 A.3d 121, 124 (2016). However, Appellant's challenge does not relate thereto.

although Appellant filed several pre-trial motions seeking to suppress and/or preclude his pre-arrest BAC, Appellant did not challenge or present any claim that his pre-arrest blood draw/testing was involuntary, performed without his consent, and/or was coerced. Rather, as the trial court indicates in its Rule 1925(a) opinion, Appellant presented this specific claim for the first time in his court-ordered Rule 1925(b) statement. Consequently, Appellant's failure to raise the issue of his consent to the blood draw and testing in the trial court precludes our review of the claim.[11] **See** Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); **Commonwealth v. Watson**, 835 A.2d 786 (Pa.Super. 2003) (holding the failure to raise an issue in the trial court may not be cured by submitting the issue for the first time in a Rule 1925(b) statement).

With regard to Appellant's second specific argument, Appellant avers the trial court erred in refusing to preclude the Commonwealth from using his medical records (particularly his pre-arrest BAC from blood drawn at 5:30 p.m. at Arnot Ogden for medical purposes) as the Commonwealth's use of such violated Appellant's doctor-patient privilege. In this regard, Appellant argues that his medical records containing his pre-arrest BAC are

---

[11] On appeal, Appellant offers no argument that he is entitled to retroactive application of **Birchfield**, despite his failure to preserve his challenge to the voluntariness or lack of consent in the trial court.

privileged under New York's statutory and case law related to the doctor-patient privilege in criminal cases, but that there is no such impediment to the Commonwealth's use of his medical records in a criminal case under Pennsylvania's statutory and case law. Thus, Appellant argues that New York's and Pennsylvania's laws are in conflict, and in weighing the sister states' interests, the trial court erred in determining that Pennsylvania's interest was greater than New York's interest, thus holding Appellant's medical records were admissible.

Initially, we note that Appellant raises a question of law, and therefore, our standard of review is *de novo* and our scope of review is plenary.[12] ***See Commonwealth v. Williams***, 125 A.3d 425, 428 (Pa.Super. 2015) (holding that issue of conflict of law is a pure question of law).

---

[12] Citing to ***In re L.J.***, 622 Pa. 126, 79 A.3d 1073 (2013), Appellant suggests that the trial court was required to hold an evidentiary hearing prior to ruling on the instant issue since the issue was one seeking suppression of evidence, *i.e.*, his medical records. That is, he contends that our scope of review is limited to the evidentiary record that was created at the suppression hearing, and since there was no hearing, a remand is necessary.

We conclude Appellant has mischaracterized the trial court's ruling as a "suppression ruling." The record reveals that Appellant presented his issue to the trial court as one seeking to preclude or suppress the evidence. The trial court addressed the issue in the nature of a motion *in limine* seeking to preclude evidence of Appellant's medical records under New York's physician-patient privilege. Since the issue involved purely a question of law, Appellant has not explained how he was prejudiced by the trial court failing to hold an evidentiary hearing on the issue. Thus, no remand is necessary on this basis.

As our Supreme Court has held:

> In Pennsylvania, we do not apply our law just because we have jurisdiction. Rather, we have adopted a flexible choice of law rule which weighs the interests our sister states may have in the transaction. This concept was formally adopted for criminal cases in **Commonwealth v. Sanchez**, 552 Pa. 570, 716 A.2d 1221, 1224 (1998).
>
> To start this analysis, we first note that procedural rules and substantive law require separate considerations. It is a fundamental principle of conflicts of laws that a court will use the procedural rules of its own state. "That is true in both civil and criminal cases, but especially in criminal cases as a sort of corollary to the local nature of substantive criminal law. Procedures in criminal cases are always those of the forum." Leflar, *American Conflicts Law,* Fourth Edition, § 116 (1977). Procedural rules are "that which prescribe the methods of enforcing rights." **Commonwealth v. Sanchez**, 716 A.2d at 1224. On the other hand, substantive law "gives or defines the right." **Id.**

**Commonwealth v. Eichinger**, 591 Pa. 1, 19-20, 915 A.2d 1122, 1133 (2007).

Here, the narrow issue presented (whether the physician-patient privilege precluded the Commonwealth from utilizing Appellant's Arnot Ogden medical records, including his pre-arrest BAC from blood drawn at 5:30 p.m. solely for medical purposes) does not involve a procedural law; but rather, a substantive right. **See Commonwealth v. Olivo**, 633 Pa. 617, 127 A.3d 769 (2015) (holding statute allowing expert testimony regarding victims' responses to sexual violence statute is a rule of evidence and statute is substantive rather than procedural); **Sanchez**, 552 Pa. at 576, 716 A.2d at 1224 ("A substantive right is defined as a right to equal enjoyment of fundamental rights, privileges, and immunities[.]") (citation

omitted)). Therefore, the issue must be addressed under the principles of conflict between substantive laws. *Eichinger*, *supra*.

> As noted before, our choice of law rule when there is a conflict between the substantive criminal laws of this Commonwealth and those of a sister state, requires that we analyze the policies and interests underlying the rule of each state so that the policy of the jurisdiction most immediately concerned will be applied. But it remains implicit in this analysis that there be a conflict between the substantive law of New [York] and the law of Pennsylvania.

*Id.* at 20, 915 A.2d at 1133 (citation omitted).

In arguing there is a conflict, Appellant points to the following New York statute:

> **§ 4504. Physician, dentist, podiatrist, chiropractor and nurse**
>
> **(a) Confidential information privileged.** Unless the patient waives the privilege, a person authorized to practice medicine, registered professional nursing, licensed practical nursing, dentistry, podiatry or chiropractic shall not be allowed to disclose any information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity.

N.Y. CPLR 4504(a) (McKinney). *See* N.Y. CLS CPLR 101 (providing that the CPLR governs proceedings in all courts of the state). Further, Appellant cites to *Dillenbeck v. Hess*, 73 N.Y.2d 278, 289, 539 N.Y.S.2d 707, 536 N.E.2d 1126 (1989), in which the New York appeals court held:

> [H]ospital records relating to [a] defendant's physical condition and blood alcohol content following [an] accident—indisputably falls within the scope of the physician-patient privilege as information acquired by a physician 'in attending [a defendant] in a professional capacity, and which was necessary to enable him to act in that capacity.'

- 36 -

*Id.* at 289, 539 N.Y.S.2d at 714 (quoting N.Y. CPLR 4504). This general legal precept has been extended by the New York appeals courts to criminal cases involving medical records including blood test results for treatment purposes.[13] *See People v. Elysee* 49 A.D.3d 33, 876 N.Y.S.2d 677, 847 N.Y.S.2d 654 (2007), *affirmed*, 12 N.Y.3d 100, 904 N.E.2d 813 (2009).

With respect to Pennsylvania's statute on the matter, Appellant points to 42 Pa.C.S.A. § 5929, which provides the following:

> **§ 5929. Physicians not to disclose information**
>
> No physician shall be allowed, in any civil matter, to disclose any information which he acquired in attending the patient in a professional capacity, and which was necessary to enable him to act in that capacity, which shall tend to blacken the character of the patient, without consent of said patient, except in civil matters brought by such patient, for damages on account of personal injuries.

42 Pa.C.S.A. § 5929. Pennsylvania appellate courts have held that generally "in Pennsylvania, the physician-patient privilege does not apply in criminal proceedings." *Commonwealth v. Ellis*, 608 A.2d 1090, 1092 (Pa.Super. 1992) (citation omitted).

_____

[13] However, the New York appellate courts have not extended the physician-patient privilege to a defendant's blood sample itself. *People v. Drayton*, 56 A.D.3d 1278, 1278, 867 N.Y.S.2d 825, 826 (2008) ("[U]nlike hospital records and diagnostic test results concerning a defendant's blood [alcohol] content, a blood sample does not constitute information communicated to a physician from a patient to invoke the physician-patient privilege[.]") (citations omitted)).

Therefore, Appellant is correct that there is a conflict between the sister states' general substantive rules of law regarding the physician-patient privilege and its application to criminal cases. Accordingly, we turn to an analysis of the states' policies and interests underlying the issue so that we may determine which law should be applied. *See Sanchez*, *supra*. "This approach gives the state having the most interest in the question paramount control over the legal issues arising from a particular factual context, thereby allowing the forum to apply the policy of the jurisdiction most intimately concerned with the outcome." *Commonwealth v. Housman*, 604 Pa. 596, 630, 986 A.2d 822, 842 (2009) (quotation marks and quotation omitted).

Here, in weighing the competing policies and interests, we find no error of law in the trial court's conclusion that Pennsylvania is the jurisdiction having the greater interest in the propriety of the Commonwealth using Appellant's Arnot Ogden medical records, and particularly his pre-arrest BAC. Thus, the trial court properly held that Pennsylvania law should apply.

In this regard, we recognize the purpose of N.Y. CPLR 4504 and the New York legislative intent in enacting the statutory physician-patient privilege "is to protect those who are required to consult with physician[s] from the disclosure of secrets imparted to physician[s], to protect the relationship of patient and physician[,] and to prevent physicians from disclosing information which might result in humiliation, embarrassment, or

disgrace to patients." ***People v. Abdul Karim Al-Kanani***, 33 N.Y.2d 260, [264], 351 N.Y.S.2d 969, 307 N.E.2d 43 (1973) (quotation marks, quotations, and citations omitted). We agree with the trial court that this is certainly "an important concern." ***See*** Trial Court Opinion, filed 11/2/16, at 8. However, the aim of the New York statute is not to protect those who have committed a crime or to avoid the imposition of criminal penalties.

Pennsylvania has an interest in protecting its citizens from intoxicated drivers and to prosecute such drivers, particularly where such driving causes fatalities. In the case *sub judice*, the motor vehicle collision and deaths occurred entirely in Pennsylvania, the Pennsylvania State Police investigated the collision, and the victims of the collision were residents of Pennsylvania. Further, the sole reason Appellant's blood was drawn at a New York hospital is because the accident occurred in a remote area of Pennsylvania, and due to Appellant's urgent need for treatment, he was taken to the nearest hospital, which was over the border in New York.

Accordingly, while New York has a valid interest in protecting its statutorily-created physician-patient privilege, in the case *sub judice*, this interest does not outweigh Pennsylvania's interest in securing Appellant's medical records and pre-arrest BAC results. Thus, we conclude that Pennsylvania has the greater interest in the legality of the use of Appellant's

medical records, and therefore, the trial court properly concluded Pennsylvania law should apply.[14]

Appellant's next claim is that his sentence is illegal since the trial court failed to merge his conviction on two counts of homicide by vehicle, 75 Pa.C.S.A. § 3732, with his conviction on two counts of homicide by vehicle-DUI, 75 Pa.C.S.A. § 3735. Appellant argues that there were two victims who died, Mr. and Mrs. English, their deaths arose from one single criminal episode, and homicide by vehicle is a lesser-included offense of homicide by vehicle-DUI. Consequently, he avers the crimes should have merged for sentencing purposes, resulting in him being sentenced on two counts of the greater offense (homicide by vehicle-DUI) but not on two counts of the lesser offense (homicide by vehicle).

"A claim that the trial court imposed an illegal sentence by failing to merge sentences is a question of law. Accordingly, our standard of review is plenary." *Commonwealth v. Snyder*, 870 A.2d 336, 349 (Pa.Super. 2005) (quotation marks and quotation omitted). We begin our examination of Appellant's merger claim by reviewing the statutory provisions pertinent to his challenged convictions.

The Motor Vehicle Code defines homicide by vehicle-DUI as follows:

---

[14] Appellant has advanced no argument indicating that, if Pennsylvania's law regarding the physician-patient privilege is applicable, the trial court erred in its application thereof.

Any person who unintentionally causes the death of another person as the result of a violation of section 3802 (relating to driving under influence of alcohol or controlled substance) and who is convicted of violating section 3802 is guilty of a felony of the second degree when the violation is the cause of death and the sentencing court shall order the person to serve a minimum term of imprisonment of not less than three years. A consecutive three-year term of imprisonment shall be imposed for each victim whose death is the result of the violation of section 3802.

75 Pa.C.S.A. § 3735(a).

The Motor Vehicle Code defines homicide by vehicle as follows:

Any person who recklessly or with gross negligence causes the death of another person while engaged in the violation of any law of this Commonwealth or municipal ordinance applying to the operation or use of a vehicle or to the regulation of traffic except section 3802 (relating to driving under influence of alcohol or controlled substance) is guilty of homicide by vehicle, a felony of the third degree, when the violation is the cause of death.

75 Pa.C.S.A. § 3732(a).

Regarding the merger of sentences, the legislature has provided that:

No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S.A. § 9765. "The statute's mandate is clear. It prohibits merger unless two distinct facts are present: 1) the crimes arise from a single criminal act; and 2) all of the statutory elements of one of the offenses are included in the statutory elements of the other." ***Commonwealth v. Baldwin***, 604 Pa. 34, 39, 985 A.2d 830, 833 (2009).

In the case *sub judice*, assuming, *arguendo*, the crimes arose from a single criminal act, we disagree with Appellant that "all of the statutory elements of one of the offenses are included in the statutory elements of the other." **Id.** In this regard, we note that, in **Commonwealth v. Neupert**, 684 A.2d 627 (Pa.Super. 1996), this Court held that homicide by vehicle-DUI and homicide by vehicle do not merge. Specifically, we held:

> The elements of Homicide by Vehicle are not included in the elements of Homicide by Vehicle-DUI. In fact, the crimes require proof of different elements. Homicide by Vehicle requires the cause of death to be the result of a violation of a motor vehicle law or ordinance other than a DUI violation; for example,[ as the appellant pled guilty to in **Neupert**,] racing on highway and failure to yield. On the other hand, Homicide by Vehicle-DUI explicitly requires a DUI conviction as an element of the crime.

**Id.** at 629. **See Commonwealth v. Collins**, 564 Pa. 144, 764 A.2d 1056 (2001) (adopting **Neupert's** analysis and holding homicide by vehicle and homicide by vehicle-DUI do not merge for sentencing purposes since the legislature crafted the statutory elements of the two offenses as mutually exclusive as homicide by vehicle requires a non-DUI Vehicle Code conviction, while homicide by vehicle-DUI requires a DUI conviction).

In the instant case, in addition to DUI, Appellant was convicted of numerous laws relating to the use of his vehicle/the regulation of traffic.

Thus, **Neupert** and **Collins**[15] are on point, and we conclude the crimes of homicide by vehicle and homicide by vehicle-DUI did not merge for sentencing purposes. Consequently, we reject Appellant's instant claim.[16]

Appellant's next claim is that his sentence is illegal since the trial court failed to merge his aggravated assault by vehicle conviction, 75 Pa.C.S.A. § 3732.1, with his conviction for aggravated assault by vehicle-DUI conviction, 75 Pa.C.S.A. § 3735.1. Appellant argues that there was one victim (C.M.), the crimes arose from one single criminal episode, and aggravated assault by vehicle is a lesser-included offense of aggravated assault by vehicle-DUI. Accordingly, he avers the crimes should have merged for sentencing purposes.

Assuming, *arguendo*, the crimes arose from a single criminal act, we disagree with Appellant that "all of the statutory elements of one of the offenses are included in the statutory elements of the other." **Baldwin**, 604 at 39, 985 A.2d at 833. Similar to the statutes for homicide by vehicle and homicide by vehicle-DUI, the legislature has crafted the statutory elements of aggravated assault by vehicle and aggravated assault by vehicle-DUI as mutually exclusive since aggravated assault by vehicle requires a non-DUI

---

[15] We note that 42 Pa.C.S.A. § 9765 was enacted after the decisions in **Neupert** and **Collins**; however, the appellate courts' analysis in these cases is consistent with Section 9765.

[16] Appellant recognizes the Supreme Court's holding in **Collins** and notes he is raising the merger issue for purposes of preservation.

Vehicle Code conviction, while aggravated assault by vehicle-DUI requires a DUI conviction. *See* 75 Pa.C.S.A. § 3732.1 and 3735.1.[17] Consequently, for similar reasons as those set forth *supra* in rejecting Appellant's merger claim related to homicide by vehicle and homicide by vehicle-DUI, we reject Appellant's instant merger claim.

In his final claim, Appellant alleges the trial court abused its discretion in considering improper factors in imposing individual sentences in the aggravated range. Specifically, Appellant contends that the sentencing court (1) improperly considered and punished him by considering his lack of remorse and (2) improperly "double-counted" his prior criminal history.

A challenge to the discretionary aspects of sentencing is not automatically reviewable as a matter of right. ***Commonwealth v. Hunter***, 768 A.2d 1136 (Pa.Super. 2001). Prior to reaching the merits of a discretionary sentencing issue:

> We conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, ***see*** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, ***see*** [Pa.R.Crim.P. 720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

---

[17] The text of the statutes is set forth *supra* in connection with our discussion of Appellant's sufficiency of the evidence claim.

*Commonwealth v. Evans*, 901 A.2d 528, 533 (Pa.Super. 2006) (citations omitted).

Here, Appellant filed a timely notice of appeal and a timely post-sentence motion adequately preserving his discretionary aspect of sentencing claims. Further, he included a separate Pa.R.A.P. 2119(f) statement in his appellate brief. As to whether Appellant has presented a substantial question, we note the following:

> The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process.

*Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa.Super. 2010) (citation, quotation marks, and quotation omitted).

This Court has previously found a substantial question to have been raised when an appellant alleged the sentencing court improperly considered the appellant's failure to express remorse. *Commonwealth v. Bowen*, 975 A.2d 1120 (Pa.Super. 2009). Further, we have found the claim the sentencing court improperly "double-counted" an appellant's prior criminal history when considering his sentence because his past criminal convictions were already taken into account when his prior record score was calculated raises a substantial question. *Commonwealth v. Goggins*, 748 A.2d 721 (Pa.Super. 2000) (*en banc*). Accordingly, we conclude Appellant has

presented a substantial question and will proceed to review the merits of his claims.

It is well-settled that:

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

**Commonwealth v. Gonzalez**, 109 A.3d 711, 731 (Pa.Super. 2015) (quotation omitted).

In rejecting Appellant's claim, the trial court relevantly indicated the following:

[Appellant] argues that the court erred in weighing its conclusion that [Appellant] "lacked remorse" in determining that it was appropriate to impose sentences in the aggravated range as this violates [Appellant's] presumption of innocence and violates his Constitutional rights. [Appellant's] claim is meritless.

On January 7, 2016, after consideration of a pre-sentence investigation report, statement by defense counsel[,] and testimony presented on behalf of the Commonwealth, [Appellant] was sentenced in the aggravated range as follows:

Two counts of Homicide by Vehicle While Driving Under the Influence 60-120 months[.]

One count of Aggravated Assault by Vehicle While Driving Under the Influence 48-96 months[.]

Two counts of Homicide by Vehicle 30-84 months.

One Count of Aggravated Assault by Vehicle 24-60 months.

"When imposing a sentence, the sentencing court must consider the factors set out in 42 Pa.C.S.A. § 9721(b), that is, the

- 46 -

protection of the public, gravity of the offense in relation to [the] impact on [the] victim and community, and rehabilitative needs of the defendant...." "And, of course, the court must consider the sentencing guidelines."

***

The reasons [the sentencing court imposed] sentences in the aggravated range [were] set forth as follows:

> "[T]his is [Appellant's] fifth [DUI] charge in his lifetime—five, five times. As the Commonwealth aptly stated, [he] didn't learn his [lesson] the first [time], he didn't learn the second time, [he] didn't learn the third time, he didn't learn the fourth time, so here we are. Has he learned now?...[The court doesn't] think he has. [The court] thinks that he, as one of the witnesses here today state[d], he—[Appellant] has shown absolutely no remorse, he showed no, no sorrow or remorse through the trial, he showed no remorse here today. Even if he didn't take responsibility for—for the accident or take responsibility for his actions or drinking and driving or violating the law and causing an accident, he has never shown any remorse that he was involved in an accident where people were seriously injured and the parents of these young children died as a result of the accident."

[N.T., 1/7/16, at 43].

Further, the court noted, "The sentence will...protect our community and any other community that [Appellant] resides in [with the] hope that he will not be consuming alcohol and getting behind the wheel of a vehicle again." [*Id.*] The pre-sentence investigation was considered, noting the number of previous [DUI] convictions [Appellant] had between 2008 and 2009. [*Id.* at 34]. It was also noted [Appellant] had been charged with [DUI] in 2012 in Tioga County, New York and was out on bail when the instant offense was committed. [*Id.*] [Appellant's] driving record is atrocious, beginning in 1992 with numerous exceeding maximum speed limits, suspensions for the prior [DUI] convictions, failure to keep right, aggravated unlicensed traffic device violations, red light violation, and speeding. [*Id.* at] 36-37.

[Appellant's] focus on lack of remorse is misplaced. The trial court indicated that even claiming the accident was not his fault, [Appellant] showed no remorse for being in an accident when individuals died. There were many other reasons for an aggravated range as set forth above.

Clearly, the protection of the public, as well as the gravity of the offense as it relates to the impact on the lives of the surviving victims,...and the rehabilitative needs of [Appellant] [required] sentences within the aggravated range.

Trial Court Opinion, filed 10/27/16, at 18-21 (quotations omitted).

We find no abuse of discretion in this regard. Specifically, this Court has held that "it is undoubtedly appropriate for a trial court to consider a defendant's lack of remorse as a factor at sentencing, provided that it is specifically considered in relation to protection of the public, the gravity of the offense, and the defendant's rehabilitative needs." *Bowen*, 975 A.2d at 1125. Here, the record reveals the trial court properly considered Appellant's lack of remorse in this regard.

Moreover, as to Appellant's claim the trial court "double-counted" his prior criminal history, while the trial court emphasized Appellant's repeated DUIs and lengthy driving record, it relied upon numerous factors in imposing the sentences. *See Commonwealth v. Mills*, 496 A.2d 752, 753-54 (Pa.Super. 1985) (stating that courts are allowed to consider prior conviction history along with previous unsuccessful attempts to rehabilitate among other factors). Finally, we note the trial court specifically indicated it had reviewed Appellant's pre-sentence investigation report, and thus "we can assume the sentencing court was aware of relevant information regarding

[Appellant's] character and weighed those considerations along with mitigating statutory factors." ***Commonwealth v. Corley***, 31 A.3d 293, 298 (Pa.Super. 2011). Accordingly, we find no merit to Appellant's discretionary aspects of sentencing claims.

For all of the foregoing reasons, we affirm.

Affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/25/2017